(43 App. Div. 284.)

### NORTHRUP et al. v. PIZA.

(Supreme Court, Appellate Division, Fourth Department. September 20, 1899.)

1. INSURANCE—AGENT—AUTHORITY—NOTICE.

>   One who solicits fire risks, and then submits them to an agent of a fire insurance company for rejection or acceptance, and who is paid a certain per cent. on the premiums on the policies secured by him, and who has no authority to effect insurance or accept risks, is not an agent of the insurer, though he has authority to collect the premiums, and pay them over to the agent; hence notice to him is not notice to the company.

2. SAME—POLICY—INDORSEMENT—WARRANTY.

A fire insurance policy on adjoining buildings, in process of construction, described the buildings, and contained a clause granting the privilege of finishing construction, and a statement that it was understood that the division walls extended to the roof between the different buildings. Subsequently an indorsement was made by attaching another writing to the policy, which recited that on and after the date of attachment the policy was to cover property as therein described, and not as theretofore, and described the buildings, and provided that the policy should cover certain fixtures not originally included, but nothing was said about the division walls. *Held*, that the indorsement did not abrogate the warranty in regard to division walls.

Spring, J., dissenting.

Appeal from trial term, Oneida county.

Action by Milton M. Northrup and another against Joshua Piza to recover on an insurance policy. From a judgment dismissing the complaint, plaintiffs appeal. Affirmed.

Argued before HARDIN, P. J., and ADAMS, McLENNAN, SPRING, and NASH, JJ.

Thomas S. Jones, for appellants.
Robert Weil, for respondent.

NASH, J. This action is upon a policy of insurance issued by the defendant and his associates, who were underwriters engaged in the business of insuring property against loss by fire under the name of the South & North American Lloyds, transacted for them by Whipple & Co., of New York, their attorneys. The policy was issued and delivered to the plaintiffs on the 4th of April, 1894, by which it in terms insured the plaintiffs to the amount of $20,000 for the term of three years from the 4th day of April, 1894, at noon, to the 4th day of April, 1897, at noon, against loss by fire to the following described property, to wit:

"$2,000 on the brick building situate on the east side of Genesee street and 100 feet northerly from Clinton Place, located on lot 371 Genesee street. $2,000 on the brick building adjoining above-described building, and located on lot 371 Genesee street. $2,000 on the brick building adjoining last-mentioned building, and located on 369 and 371 Genesee street. $2,000 on the brick building adjoining last-mentioned building, and located on lot No. 369 Genesee street. $2,000 on the brick building adjoining last-mentioned building, and located on lot No. 369 Genesee street, all in Utica, N. Y. Privileges for dwelling occupation only, for alteration and repairs, for all mechanics' work to complete said building, and to effect other insurance hereon. It is understood that entire division walls extend to roofs between each of the above-described buildings. $10,000 on personal property particularly described in the policy."

The policy provided that, "In any matter relating to the insurance, no person, unless duly authorized in writing, shall be deemed the agent of the underwriters." The policy was procured for the plaintiffs by Porter & Armstrong, insurance agents and brokers, of New York City, to whom the policy was delivered by Whipple & Co., defendants' attorneys, and by Porter & Armstrong delivered to plaintiffs, who paid the premium to Porter & Armstrong, who paid the same, less their commission, to Whipple & Co. On or about the 15th day of May, 1895, upon application of the plaintiffs, the insurers put

upon said policy an indorsement by annexing thereto, without any new or other consideration, a writing as follows:

"On and after this date this policy to cover as below, and not as heretofore.

"The Genesee.

"Northrup & Latcher.

"$2,000 on the brick building situate on the easterly side of Genesee street, near Clinton Place, and located on lot No. 371 Genesee street, Utica, N. Y. $2,000 on the brick building adjoining above-described building, and located on lot No. 371 Genesee street, Utica, N. Y. $2,000 on the brick building adjoining the building last mentioned, and located on lots Nos. 371 and 369 Genesee street, Utica, N. Y. $2,000 on brick building adjoining last-mentioned building, and located on lot 369 Genesee street, Utica, N. Y. $2,000 on the brick building adjoining last-mentioned building, and located on lot No. 369 Genesee street, Utica, N. Y.,—all known as 'The Genesee.' It is understood that the insurance on the buildings shall cover and apply to the foundations, and cover all fixtures of the nature of elevators, platforms, and all permanent fixtures for heating and lighting, and for the general use and occupation of the buildings. $10,000 on personal property, as in the policy."

The property was totally destroyed by fire on the 3d of March, 1896. Notice of the fire was given, and due proofs of loss were served. It appeared from the evidence adduced that there were not five distinct buildings, separated by entire division walls. This fact was brought out by way of defense, and in reply thereto, and for the purpose of showing a waiver of the warranty that the buildings were distinct, and separated by entire division walls, the plaintiffs gave evidence to the effect that Porter, of the firm of Porter & Armstrong, the insurance agents through whom the plaintiffs effected the insurance, had, before the original policy was issued, been through and examined the buildings, and at the time the policy was issued had knowledge that the division walls were not entire, and that the buildings were not separate and distinct. The plaintiffs claimed that Porter was the agent of the insurers, and that his knowledge was their knowledge, and hence this defense was waived. The court held, granting the defendants' motion for a nonsuit, that there was a breach of the warranty, and that it had not been waived.

We held (Northrup v. Porter, 17 App. Div. 80, 44 N. Y. Supp. 814), in an action arising upon another policy on the same property, containing a similar clause descriptive of the buildings, that the misdescription was material to the risk, and that the plaintiffs were not entitled to recover, unless the jury found that the defendant became an underwriter on the policy, with knowledge of the manner in which the building was constructed. The question here is whether there was a waiver of the warranty that the division walls were without openings. Porter & Armstrong, as insurance agents, had, prior to April 4, 1894, the date of the issuing of the policy in suit, insured the buildings of the plaintiffs in large amounts, in companies of which they, Porter & Armstrong, were agents. A short time prior to April 4, 1894, one of the plaintiffs (Latcher) was in New York, and applied to Porter, at the office of Porter & Armstrong, and said to him:

" 'We want to get $40,000 or $50,000 worth of insurance.' He (Porter) said, 'The old-line companies won't cut your rate in the Utica any more; but we are

agents for the best two Lloyds insurance companies that there are.' He says, 'All our leading merchants are insuring in those,' and he took and showed me a list and the size of the policies of these various ones that had insured in those. There was perhaps 75 names on that list, and among the number was Macy's, I remember. And he says, 'I will guaranty that if you have a loss under this Lloyds insurance that you will be paid just as promptly as you would in the old-line companies.' I said I didn't know anything about the Lloyds insurance; it was new to me; that all we had was old-line companies. 'Well,' said he, 'we are agents for them.' He said that they were agents for two of the best, and I think he mentioned the South and North America and the Columbia. He says, 'They can do business a great deal cheaper than the old-line companies, because we are limited to 25 per cent. to do business, and we will make the rate what we agreed upon.' I think it was 50c. a hundred. I said he could write $40,000, and I went back home that day, or the next, and within two or three days we got two or three policies from them."

It appears from the testimony of David E. Casey, of the firm of Whipple & Co., called as a witness by the plaintiffs, that Armstrong, of the firm of Porter & Armstrong, brought the application for the policy in suit to the office of Whipple & Co., and reported it as an A1 apartment or dwelling risk, informing Whipple & Co. that there were five separate and distinct dwellings, each one separated by a partition; and that, relying upon that statement, Whipple & Co. accepted the risk, and issued the policy. Casey testified in regard to the dealings of his firm with Porter & Armstrong as follows:

"Porter & Armstrong, at the time they brought this risk to us, were a leading fire insurance firm in New York. They were fire insurance brokers. They had had dealings with us when this organization started. They transacted a brokerage business with us. They came into our office, and presented their risks over the counter, and, if we liked the risk, and were satisfied with it, we wrote the policy. Day in and day out, they were in the same block with us, and in the same line of business. If we didn't like their risk, we rejected it. Very often they brought us risks we didn't accept." Redirect examination by Mr. Jones: "Prior to the issuance of this policy in 1894, I have often taken, through Porter & Armstrong, and issued, policies, as many as ten a day, and then a week might elapse that we did not take a risk from them. Ordinarily, every month, prior to the issuance of this policy in April, 1894, we might have taken as high as fifty risks a month from them. I think the number of policies that we issued through Porter & Armstrong increased, because we got better known, and were doing a better business. On all of the business that we did with Porter & Armstrong, and the policies issued both before and after the issuance of this policy, a commission of 15 per cent. was allowed in the adjustment of our accounts monthly upon all of the premiums paid for the respective policies. That was the method of compensation and the fixed amount between us." Recross-examination by Mr. Wells: "We allowed that same compensation to every other broker who brought us business."

Both upon principle and authority we think it must be held that in obtaining and issuing this policy Porter & Armstrong were not the agents of the insurers, or authorized to represent them in matters pertaining to the acceptance of the risk. Their statement that they were agents did not, of course, make them such; and it does not appear from what occurred between Latcher and Porter at the office of Porter & Armstrong that they did anything there as agents of these underwriters. It seems that Porter took the application from Latcher, who left it with him to procure the policy and send it to the plaintiffs. His firm did nothing more than to apply to the attorneys of the insurers, making the representations which it appears were made, and get an acceptance of the risk,—a mere act of broker-

age on their part. They had no authority whatever, so far as the evidence shows, to do or perform any act for the insurers, except to transmit the policy, and receive and pay over the premium to Whipple & Co. The decisive test as to whether they were authorized to waive any provision of the policy, or whether any act of theirs would conclude the insurers as to any defense they might have, would seem to be, did they have any authority to effect insurance or to accept risks for them? The evidence does not suggest that they did. The distinction between broker and agent is stated in Arff v. Insurance Co., 125 N. Y. 63, 25 N. E. 1074, by Peckham, J., as follows:

"What is understood under the designation of an 'insurance broker' is one who acts as a middleman between the insured and the company, and who solicits insurance from the public under no employment from any special company, but, having secured an order, he either places the insurance with the company selected by the insurer, or, in absence of any selection by him, then with the company selected by such broker."

The fact that insurance brokers receive commissions from the companies for such risks as they procure does not constitute them agents of the companies. Andrews, J., in Devens v. Insurance Co., 83 N. Y. 171.

The case here cannot be distinguished from that of Allen v. Insurance Co., 123 N. Y. 6, 25 N. E. 309, where it was held that a mere insurance broker cannot be held to be an agent of an insurance company without evidence of some action on its part, or of facts from which a general authority to represent it may be fairly inferred. There one Noble was a fire insurance broker, resident during the summer months at Lake Placid, where was also the hotel property of the plaintiff. Noble applied to the plaintiff, Allen, to insure his hotel and personal property, and he agreed that Noble might procure such insurance; and the amount of $4,630 was placed with the defendant. This figure was the aggregate of sums apportioned upon various items of property. Noble wrote out upon a piece of paper the apportionment of the insurance, and added a clause giving to the assured certain privileges as to the use of oil, repairs, and for other insurance. This paper writing was then transmitted to the defendant's office in New York City. The defendant afterwards sent to Noble a policy for the amount mentioned. Upon the face of the instrument was attached the paper forwarded by Noble, but with a change in that part of the writing which privileged the assured to make other insurance, limiting the amount. The office which Noble performed was to solicit the insurance, apply for the policy, deliver it, and receive the premium. Held, that the fact that Noble, at the time he delivered the policy, knew of other insurance by plaintiff exceeding the sum limited, did not constitute a waiver of the condition of the policy, or estop the defendant from claiming a forfeiture.

The point is urged upon us that the indorsement made upon the policy on the 15th of May, 1895, has the effect of doing away with the warranty as to division walls. We cannot so regard it. The indorsement is to be read into the policy, so that the policy as originally written and the indorsement may be read together as one in-

strument. The provisions of the two instruments, read separately or together as one, are not conflicting. The policy contains a warranty that the division walls are entire. The indorsement simply describes the five buildings as the property covered by the policy, and that it shall also cover and apply to their foundations, all fixtures of the nature of elevators, platforms, and all permanent fixtures for heating and lighting. The original policy contained a privilege for dwelling occupation only. By the indorsement the insurance covers the general use and occupancy of the building. The original provided for alterations and repairs and for all mechanics' work to complete the building. The addition gives "permission to make alterations, improvements, and repairs without notice, and this policy to cover the same; also to keep such articles and materials as is necessary for the use and occupancy of the buildings." Also the policy was made to cover "all other personal property of every description belonging to the insured, whether specified or not, belonging to and for the use and occupancy of the buildings, contained therein." The only evidence relating to the making of the indorsement, other than that shown by its terms, is the testimony of Mr. Latcher to the effect, simply, that he sent the policy to Porter & Armstrong by mail, and it was returned with the indorsement attached. In the absence of evidence of any negotiations looking to a release of the warranty as to the division walls, or of an express agreement in regard thereto, it must be presumed that the indorsement upon the policy was for the purpose of making its provisions applicable to the completed buildings, and to cover the additions thereto mentioned in the indorsement. We therefore regard the indorsement as defining merely the additional insurance which the policy should cover or include, and that all of the conditions and warranties contained in the policy as originally issued remained unimpaired, and in full force and effect, after the indorsement as before. The judgment affirmed, with costs.

ADAMS and McLENNAN, JJ., concur. HARDIN, P. J., not voting.

SPRING, J. (dissenting). The original policy was issued April 4, 1894. It described five buildings, which were covered by it, each in the sum of $2,000. The policy restricted occupancy to dwelling only, permitted alterations and repairs, and the completion of the buildings, as they were unfinished at the time of the issuance of the policy; and then contained this clause: "It is understood that entire division walls extend to the roofs between each of the above-described buildings." This was a material provision, and was untrue in fact, for a hallway led across the entire rear portion of the building, and open courts were left, into which windows opened from each adjacent apartment. In May, 1895, at the instance of the plaintiffs, the authorized agents of the defendant made and executed a written modification of this policy, which was attached to it. This was designed as a substitute for the original policy. The statement preceding the description of the property is as follows: "New

York, May 15th, 1895. On and after this date this policy to cover as below, and not as heretofore." The modified statement contained not only a complete description of the property covered by the policy, but the provision as to manner and use and occupancy is included in it. It included specifically foundations, elevators, platforms, permanent fixtures for heating and lighting, most of which would come within the compass of the policy without specific mention. Permission to make alterations and repairs was given in the original policy, and in the amended one as well, only in the latter it was provided that such repairs could be made "without notice," which, in effect, made no change, as notice was not prescribed in the original policy. In the amended policy a general occupancy was permitted, although the building was designed and used for an apartment house only. The modification in precise terms included all personal property contained in the building, but the original policy, aside from a very elaborate enumeration of personal effects, included also "the café and furnished apartments, all contained in the above-described buildings"; so that in this respect the modification only altered the verbiage, but it applied to the same property as the original policy. The clause pertaining to the completion of the building was eliminated, as it was then finished. The provision as to division walls was omitted. One or two things are apparent in this modification: (1) The agents Whipple & Co. must have possessed information as to the condition of the buildings when they prepared and gave life to this modified policy. They knew the building was completed, otherwise they would not have stricken out that clause permitting its completion. They knew the elevators were in operation, and the heating and lighting fixtures in use, or there would have been no definite inclusion of them. And they must have known the walls were not entire to the roof, or they would not have eradicated of their own motion that significant and important provision in the original policy. (2) It is equally obvious that the modification was designed as a substitute for the original policy, except as to those printed portions ingrafted in the policies of this Lloyd company. The provision relating to division walls in the original policy is in the paragraph restricting occupancy to dwelling only, allowing alterations and repairs, and authorizing the completion of the building. This entire paragraph was rewritten, and substantially changed. The attention of the underwriters was therefore called to this paragraph carefully, and it is not to be presumed they inadvertently omitted this important statement as to division walls. Its omission is significant, and indicates an intent on their part to relieve the insured from a representation confessedly untrue, and which, if retained, destroyed the validity of the policy. The familiar doctrine is urged that a waiver of forfeiture will not be inferred, but must be established by preponderating evidence. In this case the modification was the product of the agents of the defendant. They prepared it, and its composition shows their attention must have been specifically directed to the representation pertaining to division walls. Either these agents purposely omitted the clause to deceive the insured, and pass upon them an invalid policy, or else the omission

was designed to waive the representation. They possessed as much knowledge of this clause as of any other in the policy which they left out or altered. The modification consequently is either valid as an entirety, or else of no force whatever. It accordingly seems clear that Whipple & Co. knew the representation that entire division walls extended to the roof was a misstatement, and with that knowledge consented to eliminate it from the modification. The best evidence of their intention is found in the act itself, of so vital import to these plaintiffs. This intention need not be expressed in words. As was said in Kiernan v. Insurance Co., 150 N. Y., at page 194, and 44 N. E., at page 699:

"There may be a waiver by express agreement or through estoppel, but neither is required to effect the result, as words or acts from which an intention to waive may reasonably be inferred are sufficient, at least when acted upon."

It is a principle well settled in the construction of policies of insurance that, if the policy is forfeited, or rendered invalid, the recognition of it as a binding instrument, after knowledge of its nullity, precludes the insurance company from asserting the forfeiture. The act of recognition is deemed to be a waiver, and a new agreement is unnecessary to support it. Titus v. Insurance Co., 81 N. Y. 410; Walker v. Insurance Co., 156 N. Y. 628, 51 N. E. 392. If, at the time of the issuance of the policy, the authorized agents of the defendant knew that the buildings were not separated by continuous division walls, and understood how they were constructed, the defendant could not assert the misstatement as a defense. McNally v. Insurance Co., 137 N. Y. 389–396, 33 N. E. 475. If, later on, he learns of the misstatement, and consents to its erasure, he is in precisely the same situation. A waiver after forfeiture is certainly of no greater importance, and requires no greater circumstances to establish it, than a consent to strike out a provision in a policy which, at the election of the insurer, may ripen in a forfeiture. In the latter case the insured keeps alive a policy he might terminate on the assumption that his property is indemnified against loss. In the former case the loss has occurred, and he is at the mercy of the insurer. And yet courts, in seeking to preserve the insurance for the man who has paid for it, are alert to give effect to any conduct on the part of the insurer which, fairly considered, indicates a purpose to waive a defense otherwise valid. Whipple & Co. were not bound to accede to the request of the plaintiffs to modify the policy. They could have declined to change the agreement of their principal. Had they taken that position, the plaintiffs would have known the warranty in their policy would be asserted as a defense. They would have understood they were carrying $20,000 of insurance which was no indemnity to them whatever. They could have procured the cancellation of the policy, and obtained another. They would be entitled, in this event, to the repayment of the unearned premium. But the agents of the defendant did not take that position. They prepared and signed a modification, satisfactory to the insured, and the vitiating provision was stricken out. They stated to the plaintiffs, in effect, that they waived their right to assail the policy by reason of this misstatement. This conduct of

these agents gave life to the policy. The defendant is in the same position as if he had signed and delivered to plaintiffs an instrument reciting that he would not avail himself of this defense. The plaintiffs received the paper, acted upon it, and let the policy continue undisturbed. The original policy containing this untruthful material statement as to the existence of the division walls was an invalid, unenforceable instrument. The parties consented to expunge the condition which made it invalid. They agreed that it should be made a vital, enforceable contract. The insured forebore terminating the policy and taking out another. That constituted a sufficient consideration for the new agreement. But it is not necessary to show a new consideration to give force to the changed instrument, for the parties to it made the altered instrument. It was the act of the defendant. If a policy contain the statement, inadvertently made, that the property is unincumbered, and in fact it is subject to a mortgage lien, and the insured, upon ascertaining that fact, so informs the insurer, and another policy is issued, omitting the untruthful statement, the insurer ought not to evade payment when a loss occurs, because, forsooth, the second policy is unsupported by any new consideration. The assent to the alteration of any instrument, however vital, precludes either party impugning the legality of the altered instrument. Bank v. Hall, 14 N. J. Law, 583; Collins v. Collins, 51 Miss. 321; Hill v. Barnes, 11 N. H. 395.

The judgment should be reversed, and a new trial ordered, with costs to the appellants to abide the event.