ROSARIO MUSUMECI et al., Respondents, *v.* STATE OF NEW YORK, Appellant. (Claim No. 51310.)

CHARLES C. CRISAFULLI et al., Respondents, *v.* STATE OF NEW YORK, Appellant. (Claim No. 51330.)

ANTHONY CALTABIANO et al., Respondents, *v.* STATE OF NEW YORK, Appellant. (Claim No. 51360.)

Fourth Department, January 17, 1974.

*Louis J. Lefkowitz, Attorney-General (J. Lawson Brown* and *Ruth Kessler Toch* of counsel), for appellant.

*Richard C. Mitchell* for respondents.

CARDAMONE, J.    During the months of May and June, 1969 claimants' muck farms located to the east of the City of Fulton in the Town of Volney, Oswego County, were flooded due to a surcharge of diffused surface waters into the flow of Waterhouse Creek, which drained the three farms in question.    The claimants alleged that the flooding was caused by the State's relocation of Route 57 (now Highway 481) between Fulton and Three Rivers.    The State contended that the flooding was due to abnormally heavy rainstorms.    The Court of Claims tried only the issue of liability and determined that the State was liable for the flooding of claimants' lands concluding that it was caused by the State's negligent design of the relocated highway.

The pertinent facts may be briefly stated.    The State's right of way during the construction and relocation of Route 57 was denuded of brush, grass and vegetation.    The relocated highway was elevated with steep banks on both sides.    At the bottom of these banks, the State constructed drainage ditches which collected the run-off diffused surface water from the highway and carried it from the high to the low points in each of the two watersheds here involved — one watershed being drained by the north branch and the other by the south branch of Waterhouse Creek.    At the low point of the watershed drained by the north branch of the creek the State constructed a 66-inch culvert under relocated Owens Road (the 24-inch culvert which went under old Owens Road was left in place).    At the low point of the watershed drained by the south branch of the Waterhouse Creek a 123-inch by 81-inch concrete arch was built under relocated Highway 57.    The record amply establishes that the run-off coefficient prior to the denuding of the State's 250-foot right of way had been .15, and after the land was cleared of trees and brush it was .70.    A .15 run-off coefficient means that 15% of the diffused surface water on the ground runs off and the remaining 85% is absorbed or evaporates; similarly, a .70 run-off coefficient means that 70% runs off and only 30% is absorbed in the ground or evaporates.    Both culverts concentrated and channeled the diffused surface waters collected into the two respective branches of Waterhouse Creek, taxing them beyond their capacity and causing these streams to overflow onto claimants' land as they flowed northerly through them.    The State's evidence with respect to an abnormally heavy rainfall sufficient to cause this extensive flooding was not found persuasive by the trial court.    The lands in question had not been flooded in 40 years, nor during this period were other lands

owned by claimants flooded although located in the vicinity but in different watersheds. The silt found on claimants' land after it drained was evidence that the flooding was not caused by rainfall but from the construction work on the new highway. Thus, the north branch of Waterhouse Creek flooded claimant Crisafulli's land when surcharged by the collection and concentration of surface waters by the ditches constructed along new Highway 481 and Owens Road into a 66-inch culvert; and the south branch of the creek flooded claimant Musumeci's land when surcharged by the collection and concentration of surface waters in the State-constructed ditches along new Highway 481 to the 123-inch by 81-inch culvert under the said highway. Waterhouse Creek flowed northerly past these two claimants' lands into a culvert under Maple Avenue less than one third the size of the upstream culverts, just noted, which were feeding it and there the creek backed up, flooded over Maple Avenue onto the north side of the road and partially on the lands of claimant Caltabiano. The State's engineers admitted that this portion of the stream was a bottleneck and could not handle the increased flowage.

The rule in New York governing the rights of owners of property with respect to diffused surface water is ancient and authoritative, predicated on two Latin maxims: *aqua currit* and *cujus est*,[1] set forth in the landmark case of *Barkley* v. *Wilcox* (86 N. Y. 140). New York is one of 30 jurisdictions which have adopted this common-law rule whose rationale at the time was based on the necessity for improving lands and encouraging the growth of public and private improvement, with the recognition that some injury would result from the building of towns and cities (*Barkley* v. *Wilcox, supra,* p. 148), and also perhaps on a philosophical preference for freedom of each landowner to do as he saw fit on his own property.[2]

Even in 1881 while deciding *Barkley* v. *Wilcox,* the Court of Appeals was careful to point out that owners of land cannot "by drains or other artificial means, collect the surface water into channels, and discharge it upon the land of his neighbor

---

1. The complete maxims are: *aquà currit et debet currere, ut currere solebat* (Water runs and ought to run, as it has used to run); *cujus est solum, ejus est usque ad coelum et ad inferos* (Whose is the soil, his it is even to the skies and to the depths below).

2. Common-law rule (more properly called common-enemy rule) because diffused surface water is considered a common-enemy which each owner may fight off or control as he is able with no cause of action for interference even if injury and damage occurs to another (5 Water and Water Rights, §§ 450.6, 451.1, 451.2, pp. 486–490 [1972]).

to his injury '' (pp. 147–148). This exception remains the law today. As recently stated: '' The right of the owner of the upper heritage to have the waters carried off is subject to the qualification that he cannot, by artificially created means, concentrate and discharge into the stream waters in quantities bey⟨ .⟩ ⟨i⟩ts natural capacity or which would, if left alone, have drained elsewhere [citations omitted] '' (*Buffalo Sewer Auth. v. Cheektowaga*, 20 N Y 2d 47, 52).

Since its adoption, the common-law rule has been modified by engrafting a third Latin maxim — *sic utere*[3] — on the two former ones. Thus, the Court of Appeals in a recent case first thoroughly discussed the *Barkley* v. *Wilcox* (*supra*) principles governing the rights of property owners with respect to diffused surface waters and concluded that improvements made in good faith to fit one's property to some rational use are permitted so long as the diffused surface water is not drained into another's property by means of artificial pipes and ditches (*Kossoff* v. *Rathgeb-Walsh, Inc.*, 3 N Y 2d 583, 589–590).

This case and indeed most controversies concerning diffused surface water involve invasions of interests in land. The legal relations are generally stated in terms of property concepts. It is plain, however, that liability imposed for interfering with diffused surface water is a tort liability. Tort law suggests greater flexibility than the rigidity of property law — and an analysis from the standpoint of the '' prerequisites of liability '' rather than the '' rights '' or '' servitudes '' of the parties' interest in the land results in a clearer and more practical focus on the fundamental considerations involved (Kinyon and McClure, Interferences with Surface Waters, 24 Minn. L. Rev. 891, 936–939). Such view has been adopted by the American Law Institute (4 Restatement, Torts, §§ 822–831, 833; 1 Restatement, Torts 2d, § 158, Illustration 5). Further, trespass or nuisance theories — both tort concepts — have long been used in this State to determine litigation concerning interference with surface water (*Gordon* v. *Ellenville & Kingston R. R. Co.*, 195 N. Y. 137; *Seifert* v. *City of Brooklyn*, 101 N. Y. 136; *Noonan* v. *City of Albany*, 79 N. Y. 470).

The evidence in the instant case clearly establishes (1) that the State constructed and used drainage ditches to collect diffused surface waters and (2) constructed and used the relocated Owens Road culvert and the arch under relocated Route 57 (Highway 481) to concentrate and to discharge the waters so

3. *Sic utere tuo ut alienum non laedas* (Use your own property in such a manner as not to injure that of another).

collected and finally (3) that a surcharge of both branches of Waterhouse Creek was caused by such increased volume of water beyond the creek's existing capacity which (4) resulted in the flooding of claimants' lands downstream. As noted, the State is not prevented from improving its property 1. matter what becomes of the diffused surface water "proviκ κ, of course, that the improvements are made in good faith to fit the property to some rational use to which it is adapted, and that the water is not drained into the other property by means of pipes or ditches" (*Kossoff* v. *Rathgeb-Walsh, Inc.,* 3 N Y 2d 583, 589–590, *supra*). Further, the mere fact that the amount of the surface water was increased did not create liability, because the amount of surface water to be discharged into a natural watercourse (here the branches of Waterhouse Creek) cannot be limited to the natural flow as it existed before the improvement by a municipality (relocation of Route 57) prevented the absorption by the soil of some portion of such diffused surface water (*Friedland* v. *State of New York,* 35 A D 2d 755). Liability attaches to the State, here, however, on this record which plainly demonstrates that the State did employ artificial means to channel the diffused surface waters in excess of the natural capacity of Waterhouse Creek despite well-settled law proscribing such conduct (*North Dakota* v. *Minnesota,* 263 U. S. 365, 372; *Fox* v. *City of New Rochelle,* 240 N. Y. 109, 112; *Barkley* v. *Wilcox,* 86 N. Y. 140, *supra*; *Noonan* v. *City of Albany, supra*).

Finally, the fact that the State is the party against whom liability is sought for interfering with diffused surface waters does not require different rules from those stated. As the Court of Appeals held 94 years ago, "A municipal corporation has no greater right than an individual to collect the surface water from its lands or streets into an artificial channel, and discharge it upon the lands of another, nor has it any immunity from legal responsibility for creating or maintaining nuisances" (*Noonan* v. *City of Albany.* 79 N. Y. 470, 476). Such is the law today (see *Buffalo Sewer Auth.* v. *Cheektowaga,* 20 N Y 2d 47, *supra*).

The judgments should be affirmed.

GOLDMAN, P. J., MARSH, WITMER and SIMONS, JJ., concur.

Judgments unanimously affirmed, with costs.