FRANKLIN E. HOWE & another *vs.* DIPIERRO MANUFACTURING COMPANY, INC. & another.

Worcester.    December 12, 1972. — January 30, 1973.

Present: HALE, C.J., KEVILLE, & GRANT, JJ.

*Water.    Real Property,* Water. *Equity Pleading and Practice,* Suit to enjoin flowage.

The combined effect of changes made by the defendants in a suit in equity in land owned by them, by filling in a pond and a swamp and enclosing a natural watercourse within a culvert, by building a black topped parking lot where the pond and swamp had been and installing a drainage system which collected surface waters and emptied them into the culvert, and by discharging cooling water from their manufacturing plant into the culvert, unreasonably caused flooding of land of the plaintiffs on the watercourse and about fifty feet downstream from the culvert [82-85]; the plaintiffs were entitled

---

to damages for the permanent injury to their property or to injunctive relief designed to restore it to its original condition, but not to both [86].

BILL IN EQUITY filed in the Superior Court on November 20, 1968.

The suit was heard by *Good,* J., on a master's report.

*Albert R. Mezoff* for the defendants.

*Harry Zarrow* for the plaintiffs.

HALE, C.J.    This suit in equity was instituted by a bill of complaint which contains, among other things, prayers for injunctive relief and for general relief. The case was referred to a master whose report was confirmed. The defendants appeal from a final decree enjoining the defendants from causing the plaintiffs' property to be flooded by reason of water flowing through a drain under the defendants' land and ordering the defendants to pay $15,000 in damages, with interest thereon. Costs were awarded to the plaintiffs. We summarize the facts found by the master.

The plaintiffs are husband and wife and are owners of real estate at 175 Oak Street where they reside, and the defendants are owners of a parcel of land at 420 Boston Turnpike. Both parcels are in Shrewsbury, Massachusetts. Abutting the plaintiffs' premises to the north is the property of one Segerson. The rear line of the plaintiffs' and Segerson's land is the easterly boundary of each. The westerly boundary of the defendants' property abuts the Segerson land, and its southwesterly corner lies about fifty feet from the northeasterly corner of the plaintiffs' land. Prior to any improvements being made on the defendants' land, two natural brooks ran through it. One of these, South Brook, passed under the Worcester Turnpike (Route 9), through a culvert which ended in the defendants' land at a small pond of thirty to forty feet diameter. The second brook joined the first at a swampy area of fifty to seventy-five feet diameter somewhat downstream from the pond. South Brook then re-formed at the southerly edge of the swampy area, continued its downstream flow to a point near the southwesterly corner of the defendants' land and

then continued on to the plaintiffs' land. It next proceeded along and across the rear part of the plaintiffs' land, eventually emptying into Lake Quinsigamond some distance away. The plaintiffs use the rear part of their land to grow vegetables and berries for sale and personal use. They have a well in this area which provides water for the garden.

In the 1960's the defendants started to fill in their land, the largest amount of fill being placed in 1967-1968. In this process, a culvert was installed through the entire length of the brook to carry its waters through the defendants' property. In 1968, the defendants' land was filled to a depth of fourteen to fifteen feet along the line of the Segerson property. The culvert terminated where the brook left the defendants' land at a point about fifty feet from the plaintiffs' land. The brook, pond, and swamp were otherwise completely filled in.

When the filling was complete, the defendants blacktopped a large part of the filled area for a parking lot and installed drains in this blacktopped area to carry off surface water. These drains were connected with the culvert. The defendants also carry on a manufacturing process on their land and in this process use about 5,000 gallons of water a day as a coolant. After such use this water is carried off through a drain running to the culvert.

Prior to being filled in, after periods of rainfall the pond and the swampy area would fill with water, and this water would then flow downstream in the direction of the plaintiffs' land without flooding any part of it.

About June of 1968, after the filling was complete and the blacktop installed, the plaintiffs observed that after rain storms the water coming from the culvert would overflow the banks of the brook downstream and that this water flooded their garden and inundated their well. On some occasions, the flooding would extend onto their property about 125 feet from the brook and, at the point of the well which was about 75 feet west of the brook, the water would be approximately one foot deep. On other occasions, the land would not be covered with water but the soil would be

turned into mud. Between June of 1968 and June of 1970 there were about twelve occasions when this flooding took place.

The master found that the fair market value of the plaintiffs' property prior to the flooding was $30,000 and found the fair market value of the property "as it now exists" to be $15,000. He found the plaintiffs' damages by reason of this flooding to be $15,000.

The master also found that the defendants made three changes to their land which could have caused the flooding of the plaintiffs' property. First, they filled in a pond and a swamp and enclosed a natural watercourse within a culvert. Second, they built a parking lot where the pond and swamp had been. This area was blacktopped and a drainage system was installed which collected surface waters and emptied them into the culvert mentioned above. Third, the defendants discharged the cooling water from their plant into this culvert.

With respect to the first change, the defendants had the right to fill in the pond and swamp[1] and to enclose South Brook "so long as the flow, as it left the defendant[s'] land, was not substantially altered . . . and so long as . . . no other special damage attributable to the change was caused to . . . [the plaintiffs]." *Kuklinska* v. *Maplewood Homes, Inc.* 336 Mass. 489, 494. As to the rights of riparian owners generally, see *Stratton* v. *Mount Hermon Boys' School,* 216 Mass. 83, 84-89.

As to the second change, the law is clear that an owner may change his land in such a way that surface waters flow onto a neighbor's property in greater quantity or in other directions than had occurred previously. *Gannon* v. *Hargadon,* 10 Allen 106, 109-110. Such is not the case, however, when the water arrives on a neighbor's land as a result of a "definite, artificial channel, directly or by seepage." *Kuklinska* v. *Maplewood Homes, Inc.* 336 Mass. 489, 492-493. In the instant case, the water was sent via an artifical

---

[1] No question has been raised as to compliance with G. L. c. 131, § 40, or its predecessor § 117C.

channel (the drains) to the culvert, a natural watercourse.[2] This fact pattern is governed by *Jackman* v. *Arlington Mills,* 137 Mass. 277, 283, 284. See also *Bainard* v. *Newton,* 154 Mass. 255, 256; *Belcastro* v. *Norris,* 261 Mass. 174, 177. The court in the *Jackman* case said that a landowner " . . . has the right to collect the surface water and the natural drainage of his land into an artificial stream, and discharge it into a natural watercourse on his own land, if the watercourse is the natural outlet of the waters thus collected, even although, by this artificial arrangement, the flow of the waters is accelerated, and the volume at times is increased, provided that this is done in the reasonable use of his own land, and that the discharge is not beyond the natural capacity of the watercourse, and the land of a riparian owner is not thereby overflowed, and materially injured. But he has no right to subject the land of another to a servitude of running water to which it is not naturally subject." 137 Mass. at 283.

The law concerning the rights of riparian owners also applies to the third change — the discharge of the 5,000 gallons of water a day into South Brook. The defendants are entitled to the reasonable use of the stream, and plaintiffs have the right to its natural flow onto their land. That the source of the water introduced by the defendants into a natural stream is a manufacturing process rather than a collection of surface waters, does not change the application of the general rule described above. See generally *Fortier* v. *H. P. Hood & Sons, Inc.* 307 Mass. 292.

Thus the defendants had the right to make the three changes to their land so long as the flow of water was not increased to the point that the plaintiffs' land was injured by a resulting overflow.

From the subsidiary facts in the master's report, we find that the combined effect of the three changes the defendants made to their land unreasonably caused flooding of the plaintiffs' property and that the injury so caused will be

---

[2] South Brook, a natural watercourse before it was enclosed, remains such in spite of the enclosure. *Braun* v. *Foxboro Co.* 346 Mass. 771.

permanent unless the defendants are ordered to rectify the condition that they have caused. It is clear that the figure of $15,000 found by the master represented his view of the diminution in the fair market value of the plaintiffs' property on the theory that the injury was permanent in nature.

This brings us to the question of the relief which should be granted. The defendants do not contest the measure of damages applied by the master, nor do they any longer contest the amount ascertained. The defendants argue, and we agree, that the plaintiffs should not be given both damages which reflect permanent diminution of the fair market value of their property and injunctive relief designed to restore the plaintiffs' property to the condition in which it would have been if it had never been injured. *Belkus* v. *Brockton,* 282 Mass. 285, 287-288. *Chesarone* v. *Pinewood Builders, Inc.* 345 Mass. 236, 241-242. Cf. *Ryder* v. *Lexington,* 303 Mass. 281, 290. In the argument before us, the plaintiffs, apparently in recognition of this inconsistency in relief granted by the trial judge, offered to waive any claim for injunctive relief. The logic and the equities of the situation dictate the acceptance of this offer.

The final decree is to be modified by striking out the provision granting equitable relief and as so modified is affirmed.

*So ordered.*