RAYMOND J. TUCKER & another[1] *vs.* V. GEORGE BADOIAN (and a companion case[2]).

Plymouth. September 14, 1978. — December 27, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Water. Drain. Real Property*, Water, Drain. *Practice, Civil*, Directed verdict.

Statement of law of the Commonwealth concerning the rights and obligations of landowners with respect to diversion of drainage water onto a neighbor's land. [912-914]
In an *action by plaintiffs seeking to recover for damages* allegedly caused to their land and the house thereon by the negligence of the defendants in making certain physical changes to their own land, thereby causing large quantities of water to collect on the plaintiffs' lot and in the cellar of their house, where there was evidence that the defendants made improvements on their land but did not build

---

[1] The other plaintiff is Helene G. Tucker.

[2] The companion action was brought by the same plaintiffs against the Morningside Realty Trust, of which V. George Badoian is trustee.

any ditches or other definite channels, it was error to deny the
defendants' motion for a directed verdict. [914-915]

In a civil action, there was no merit to the plaintiffs' contention that
the defendants were precluded from controverting the sufficiency
of the evidence merely because the trial judge instructed the jury
as requested by the defendants. [915-916]

KAPLAN, J., with whom HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS,
and ABRAMS, JJ., joined, concurring in the result, expressed the
intention to move from a "common enemy" rule to a standard of
"reasonable use" concerning the rights and obligations of a land-
owner with respect to diversion of water onto a neighbor's land.
[916-919]

TWO ACTIONS OF CONTRACT AND TORT. Writs in the Su-
perior Court dated October 8, 1970, and October 8, 1971,
respectively.

The actions were tried before *Leen, J.*

After review by the Appeals Court, the Supreme Judi-
cial Court granted leave to obtain further appellate re-
view.

*Frank J. McGee (Kevin P. Phillips* with him) for the
plaintiffs.

*William K. Mone* for the defendants.

QUIRICO, J. The plaintiffs in these two actions seek to
recover damages that they claim were caused to their
land and the house thereon by the alleged negligence of
the defendants. The plaintiffs contend that the defend-
ants negligently made certain physical changes to their
own land, which abuts that of the plaintiffs, thereby caus-
ing large quantities of water to collect on the plaintiffs'
lot and in the cellar of their house. The jury returned a
verdict for the plaintiffs in the amount of $60,000 in each
of the two actions. The defendants moved for a new trial,
and, after a hearing thereon, the judge ordered a remit-
titur of $35,000. He allowed the verdict in each case to
stand in the reduced amount of $25,000, and the plaintiffs
assented. See Mass. R. Civ. P. 59(a), 365 Mass. 827 (1974).

The defendants appealed from the judgments thus en-
tered for the plaintiffs. After hearing the parties, the
Appeals Court held that the trial judge had erred in

denying the motions of the defendant in each case for a directed verdict and ordered that the judgments for the plaintiffs be reversed. *Tucker* v. *Badoian*, 5 Mass. App. Ct. 904 (1977). The plaintiffs then filed applications for further appellate review in these two cases, and we allowed them. See G. L. c. 211A, § 11; Mass. R. A. P. 27.1, as amended, 367 Mass. 920 (1975). Three other actions brought by these same plaintiffs against other defendants and relating to the same property have been disposed of as indicated in the margin below and are not involved in the appeals of the two remaining actions.[3]

We hold, as did the Appeals Court, that in each of the two cases now before us, it was error for the judge to deny the defendant's motion for directed verdict, that the judgments for the plaintiffs should be reversed, and that judgments should be entered for the defendants.

There is no dispute over the facts leading to this litigation. The plaintiffs purchased a parcel of land, together with a single family house situated thereon, in October of 1969 from Ronald Tocco,[4] one of the original defendants who is not before us on this appeal. This parcel, designated "lot 23" during the proceedings below, lies in Marshfield near the Daniel Webster Cemetery. It is bounded on the east by Winslow Cemetery Road, on the north by land owned by Morningside Realty Trust, on the west by an old cranberry bog, and on the south by other land not involved in the case.

---

[3] Two of the actions, viz., *Tucker* v. *Tocco*, and *Tucker* v. *Patriot Homes, Inc.*, were disposed of by an order of the Appeals Court entered on October 31, 1977, summarily affirming judgments for the plaintiffs. *Tucker* v. *Patriot Homes, Inc.* 5 Mass. App. Ct. 909 (1977). The third action, against Tocco as trustee of Ronald Realty Trust, was disposed of by an order of the Appeals Court entered on December 28, 1977, affirming the judgment for the plaintiffs. This was done by the same rescript in which the Appeals Court reversed the judgments for the plaintiffs in the two actions that are the subject of the present opinion. *Tucker* v. *Badoian*, 5 Mass. App. Ct. 904, 905 (1977).

[4] In this opinion, we use the name Tocco interchangeably to mean Ronald Tocco individually, Ronald Tocco as trustee of Ronald Realty Trust, and Patriot Homes, Inc.

Before the spring of 1969, while it was yet unimproved, lot 23 was perpetually muddy and marsh-like as a result of then-existing drainage conditions. One or more artificial ponds to the east of Winslow Cemetery Road drained through a man-made ditch and culvert under Winslow Cemetery Road into a shallow channel that crossed lot 23 and debouched into a small pond or "pothole" (pothole) at the northwest corner of the lot. The pothole lay partly on lot 23 and partly on Morningside's abutting land. The only evidence concerning the origin of the culvert, channel, and pothole suggests that all three were remnants of an artificial system for flooding the cranberry bogs to the west of lot 23. In particular, there was no evidence suggesting that the channel and pothole formed part of a natural watercourse, and we shall henceforth refer to the channel as "the ditch." In addition to being the locus of the ditch-pothole system, lot 23 was also the low point of Winslow Cemetery Road. Because of the absence of storm drains in the immediate vicinity, water would frequently collect in the road next to lot 23 during heavy storms, and neighbors kept open a ditch (whose exact location was not specified during the trial) to drain this accumulation away.

During the spring and summer of 1969, Tocco built a single family house on lot 23. He first filled in the ditch and part of the pothole. He then excavated holes for a cellar and a septic tank. The cellar hole was located atop the fill in the former path of the ditch. The septic tank hole was located slightly south and uphill from the filled in ditch. During the construction period, the cellar and septic tank holes, and later the cellar and septic tank themselves, were partly filled with water. In late August of 1969, after the house was completed, a realtor showed lot 23 to the plaintiffs. The plaintiffs purchased the lot and house from Tocco on October 10, 1969, and moved in the next day.

During September of 1969, or between the time the plaintiffs first saw lot 23 and the time they purchased it,

Morningside took certain actions that form the basis of these two lawsuits. Morningside levelled off several piles of fill standing on its land, and it brought a quantity of fill onto its land, levelling the fill off for a distance of about 150 feet westerly from Winslow Cemetery Road. The apparent purpose of these filling and grading operations was to prepare a strip of Morningside's land immediately adjacent to lot 23 for a "proposed road" to connect the cranberry bog with Winslow Cemetery Road. During the course of performing the operations, Morningside may have placed fill on lot 23 next to the house (but not, apparently, atop the former ditch or in the pothole) and in a part of the pothole lying on its own land.

Within a week after taking possession in mid-October, the plaintiffs began experiencing a severe drainage problem. For a period of several months, water poured into the cellar from several places, including the point where the sewage pipe left the cellar. The basement and house smelled of raw sewage. Water that sometimes reached a depth exceeding three feet collected in the backyard to the west of the house.[5] To alleviate these problems, Tocco installed drains and pumps, filled in portions of the backyard, and dug one or two ditches across the proposed road on Morningside's land. By the end of spring in 1970, Tocco thus succeeded in curing the surface water problem. Notwithstanding this partial success, foul-smelling water continued to find its way into the basement at least until the trial of this case in January of 1975.

The plaintiffs adduced a variety of expert testimony during the trial. As we are passing on the judge's alleged error in denying the defendants' motions for directed verdicts, we summarize this testimony in the light most favorable to the plaintiffs. *Alholm* v. *Wareham*, 371 Mass.

---

[5] Although the evidence does not clearly establish the source of this water, it is reasonable to infer from the general northwesterly slope of lot 23 and the placement of the pothole in the northwest corner of the lot that the backyard water was, in effect, overflow from the pothole.

621, 627 (1976). The flooding of the plaintiffs' basement
was caused, at least in part, by the circumstance that the
water table was higher than the floor of the basement. In
addition, the high water table prevented proper effluent
filtration in the leaching field of the septic system, with
the result that raw sewage mixed with ground water and
flowed into the cellar. The grading and filling operations
on Morningside's land might have contributed to raising
the water table under the plaintiffs' land and thereby
contributed to the damage the plaintiffs concededly suf-
fered. In addition, the water table would tend to follow
the level of water in the pothole, and the jury could have
found that Morningside raised that level by filling in a
portion of the pothole on its own land.

1. The single issue of law before us is whether, on the
evidence summarized above, the judge should have di-
rected verdicts for the defendants. This court first consid-
ered the respective rights and obligations of landowners
with respect to surface drainage in *Luther* v. *Winnisim-
met Co.*, 9 Cush. 171 (1851). In that case we approved, as
being "well adapted to the case," jury instructions to the
effect that one landowner is free to stop surface water
from entering his land despite harm to his neighbor. *Id.*
at 174-175. Since 1851, we have frequently held not only
that a landowner may freely defend his land from en-
croaching surface water but also that he may with im-
punity grade and improve his land for a lawful purpose
even though he thereby diverts surface water onto his
neighbor's land. *Canavan & Manning, Inc.* v. *Freedman*,
353 Mass. 762 (1968) (embankment). *Kuklinska* v. *Maple-
wood Homes, Inc.*, 336 Mass. 489, 492 (1957) (grading for
housing development). *Maddock* v. *Springfield*, 281 Mass.
103, 105 (1932) (sidewalk and fill). *Gannon* v. *Hargadon*,
10 Allen 106, 109-110 (1865) (blocking cart ruts). We have
not distinguished between surface and ground water.
*Kennison* v. *Beverly*, 146 Mass. 467, 469 (1888). Cf. *Belkus*
v. *Brockton*, 282 Mass. 285, 288 (1933) (measure of dam-
ages same whether caused by ground or surface water);

*Wilson* v. *New Bedford*, 108 Mass. 261, 266 (1871) (no difference in character of injury).

The law of this Commonwealth was stated as follows in the *Gannon* case: "The right of an owner of land to occupy and improve it in such manner and for such purposes as he may see fit, either by changing the surface or the erection of buildings or other structures thereon, is not restricted or modified by the fact that his own land is so situated with reference to that of adjoining owners that an alteration in the mode of its improvement or occupation in any portion of it will cause water, which may accumulate thereon by rains and snows falling on its surface or flowing on to it over the surface of adjacent lots, either to stand in unusual quantities on other adjacent lands, or pass into and over the same in greater quantities or in other directions than they were accustomed to flow." 10 Allen at 109. These same principles have governed liability for damage caused by percolating ground water.

Because of our decision in *Gannon* v. *Hargadon, supra,* commentators have considered Massachusetts to follow the "common enemy" approach to surface water problems. See, e.g., 6A American Law of Property § 28.63, at 189-190 (A.J. Casner ed. 1954). Taken to its logical conclusion, the doctrine forecloses distinctions based on how drainage water is diverted from one parcel to another. E.g., 5 R. Powell, Real Property par. 730, at 438.2-438.5 (P. Rohan ed. 1977). We have instead held that a landowner may not use definite, artificial channels so as to harm his neighbor. E.g., *Chesarone* v. *Pinewood Builders, Inc.,* 345 Mass. 236, 239-240 (1962); *Cernak* v. *Kay-Vee Realty Co.,* 341 Mass. 315, 318 (1960); *Deyo* v. *Athol Hous. Auth.,* 335 Mass. 459, 467 (1957). Liability may arise either from collecting water and then discharging it directly onto the land of another, as in *Chesarone,* or from accumulating channelled water and allowing it to back up onto the land of another. See *Mahoney* v. *Barrows,* 240 Mass. 378, 378-379 (1922). There is no liability, however, without proof

that the defendant caused surface water, which might otherwise have been absorbed or have flowed elsewhere, to be artificially channelled and discharged on the plaintiff's land in a place and quantity sufficient to entitle the plaintiff to relief. *Kapayanis* v. *Fishbein*, 344 Mass. 86, 87 (1962). *Kuklinska* v. *Maplewood Homes, Inc., supra* at 493. See also *McNamara* v. *Westview Bldg. Corp.*, 4 Mass. App. Ct. 670, 672 (1976); *Kattor* v. *Sabatini*, 4 Mass. App. Ct. 835 (1976); *Howe* v. *DiPierro Mfg. Co.*, 1 Mass. App. Ct. 81, 84-85 (1973).

We recognize that the courts of several other States have recently abandoned rigid approaches like our own in favor of a more flexible "reasonable use" doctrine. E.g., *Pendergrast* v. *Aiken*, 293 N.C. 201, 210-211 (1977) (collecting cases); *Butler* v. *Bruno*, 115 R.I. 264, 274-275 (1975). If this is a trend, it is not unanimous. See *Johnson* v. *Whitten*, 384 A.2d 698, 700-701 (Me. 1978) (restating Maine law in terms compatible with our own law). Since the parties to these actions have not asked that we change the law of this Commonwealth in this area, we decide the present appeals on the basis of our long-standing rule as stated in the *Gannon* case.

2. The plaintiffs argue that the motions by Badoian and Morningside for directed verdicts were properly denied because, on the evidence we have summarized, "[t]he jury could have found negligent obstruction of surface and ground water passage upon construing the . . . roadway . . . as acting to channel water so that it was artificially retained, and by its retention deflected or backed up upon plaintiffs' land." We assume arguendo that this assertion is true. As our review of the cases shows, however, liability does not result merely from artificial diversion or retention of water. Indeed, in *Gannon* itself, where the defendant obstructed cart ruts on his land, the means used to deflect surface water were as "artificial" as those used, for example, in *Kapayanis* v. *Fishbein*, 344 Mass. 86, 87 (1962), where roof gutters and dry wells were the source of dispute. The difference between the two cases lies, as

we have said, in the distinction between altering the contour of the land and constructing definite drainage channels.

The plaintiffs rely in particular on the cases of *Belkus* v. *Brockton*, 282 Mass. 285 (1933), *Mahoney* v. *Barrows*, 240 Mass. 378 (1922), and *Wilson* v. *New Bedford*, 108 Mass. 261 (1871). Each case is clearly distinguishable from the one at bar. Liability was found in *Belkus* because the defendant obstructed a natural watercourse. See 282 Mass. at 290. In *Mahoney*, the defendant dammed up surface water that he had collected in a system of ditches, and we found liability only because those artificial structures caused the waters collected thereby to flow therefrom back onto the plaintiff's land. See 240 Mass. at 380; *Canavan & Manning, Inc.* v. *Freedman*, 353 Mass. 762 (1968) (explaining *Mahoney*). *Wilson* turned on the fact that the defendant had created a new pond by damming a natural watercourse. See 108 Mass. at 264-265.

Even viewing the evidence in the light most favorable to the plaintiffs, we discern none of the factors that were determinative in *Belkus*, *Mahoney*, and *Wilson*. The only watercourse of which there was any evidence was the man-made ditch on the plaintiffs' land, and that was filled in by the plaintiffs' predecessor in title. Although the jury might infer that Morningside *affected* the flow through this fill-in ditch by what it did on its own land, it could not possibly have found obstruction in the sense of *Belkus*. There was no evidence that Morningside built any ditches or other definite channels, or that it constructed a pond where once there was dry land. Accordingly, the plaintiffs' reliance on these three cases is misplaced.

The plaintiffs appear to argue that, because the trial judge instructed the jury as requested by the defendants, the defendants are now somehow precluded from controverting the sufficiency of the evidence. Our holding that the judge should have directed verdicts is equivalent to

holding that the cases should never have been submitted to the jury. It is irrelevant that the defendant requested instructions that might have resulted in the jury finding him liable. Cf., e.g., *Johnson* v. *United States*, 434 F.2d 340, 343 (8th Cir. 1970) (under Fed. R. Civ. P. 50 [a], defendant need not except to instructions to preserve issues raised by motion for directed verdict). The defendants moved for directed verdicts at the close of the plaintiffs' case and again at the close of all the evidence, enumerating in each motion the legal theories we have applied in this opinion. The defendants have adequately preserved their right to contest the sufficiency of the evidence. Cf. Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974) (motion for directed verdict must state grounds); *Martin* v. *Hall*, 369 Mass. 882, 884-885 (1976) (defendant must renew motion after presenting evidence). We attach no significance to possible misstatements of the law acquiesced in by defense counsel during argument of his motions. See *Wasserman* v. *Tonelli*, 343 Mass. 253, 257 (1961).

3. For the reasons stated above, we hold that the judge should have allowed the motions for directed verdicts in favor of Badoian and Morningside. The cases are remanded to the Superior Court Department with directions to enter judgments in favor of Badoian and Morningside.

*So ordered.*

KAPLAN, J. (with whom Hennessey, C.J., Braucher, Wilkins, Liacos, and Abrams, JJ., join, concurring in the result). The whole court is in agreement with the result reached in the foregoing opinion of Justice Quirico applying the "common enemy" rule. Those subscribing to the present concurrence, however, desire to state that for the future they intend a change of the doctrine.

The common enemy rule had only questionable support in the common law when it was first sponsored by

this court in the mid-Nineteenth Century. Being as-
similated to conceptions of property rather than tort, it
exhibited from the beginning a deplorable rigidity. In its
substance, however, it was anarchic. Perhaps a common
enemy doctrine served originally a public purpose by
stimulating or assisting entrepreneurship in the exploita-
tion of land.[1] But, as Brennan, J. (now Mr. Justice Bren-
nan), intimated in *Armstrong* v. *Francis Corp.*, 20 N.J.
320, 330 (1956), at a matured stage of the economy there
is little reason why costs of land development "should be
borne in every case by adjoining landowners rather than
by those who engage in such projects for profit."

As might be expected, jurisdictions espousing the rule
have civilized it in one way or another, not always with
explicit recognition of what they were doing. This court
allowed some "exceptions," and no doubt we often
reached sensible results. A like process of adjustment or
amelioration could be discerned with respect to an un-
satisfactory "natural flow" rule in vogue in another
group of jurisdictions. This started at the opposite end
and imposed liability on a possessor for interfering to the
detriment of his neighbor with the drainage of surface
waters in their natural course.

In practice and application, then, if not in terms, both
rules tended in some degree to reach a plane of reason.
Still the formulary statements on either side confused the
issues and impaired the results. Therefore, with encour-
agement from competent scholars, a respectable number
of courts over the past thirty years and more have aban-
doned the polar positions and adopted, instead, a "reason-
able use" standard which introduces, in the resolution of
quarrels between landowners about surface waters, the
considerations typical of the law of private nuisance.[2] On

---

[1] Compare the discussion in M. J. Horwitz, The Transformation of
American Law, 1780-1860, c. II (1977).

[2] In the *Armstrong* case, the matter is put in general terms thus (at
327, 330): "[E]ach possessor is legally privileged to make a reasonable

such lines the question was treated in the Restatement of Torts as promulgated in 1939.[3] The movement is described in 5 Waters and Water Rights, c. 26 (R.E. Clark et al. ed. 1972, with 1978 supplement); 5 R. Powell, Real Property pars. 729-732 (P. Rohan ed. 1977); Maloney & Plager, Diffused Surface Water: Scourge or Bounty?, 8 Nat. Resources J. 72 (1968). Among the apostasies of the courts from the older orthodoxies, a reader might consult the New Jersey case cited and the recent decisions of *Pendergrast* v. *Aiken*, 293 N.C. 201 (1977), *Butler* v. *Bruno*, 115 R.I. 264 (1975), and *State* v. *Deetz*, 66 Wis. 2d 1 (1974).

It will be understood that, in indicating the intention to move to the standard of reasonable use, we are not committing ourselves in advance to follow in every detail the position elaborated by any other court or by the Restatement. The details of the standard will evolve and be determined in the usual way through the decisional process.

Ordinarily a change of decisional law falls into place and is applied to past as well as to subsequent transactions or occurrences. In the present situation, however,

---

use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, but incurs liability when his harmful interference with the flow of surface waters is unreasonable. . . . The rule of reasonableness has the particular virtue of flexibility. The issue of reasonableness or unreasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter. . . . It is, of course, true that society has a great interest that land shall be developed for the greater good. It is therefore properly a consideration in these cases whether the utility of the possessor's use of his land outweighs the gravity of the harm which results from his alteration of the flow of surface waters."

[3] Sections 833, 822-831, spell out the detailed considerations, and the subject is renewed in Restatement (Second) of Torts: Tentative Draft No. 16, at 62-75, 131-158 (April 24, 1970); No. 17, at 22-47 (April 26, 1971); No. 18, at 1-6 (April 26, 1972).

we propose to alter a rule of long standing on which parties may have relied. Accordingly we think the new standard should be reserved for prospective application, that is, for conduct occurring hereafter, excepting future conduct so related in a continuum with past conduct that it would be unjust to apply the new standard to it. We do not apply the new standard to the instant case (which would entail reversing the judgment appealed from and remanding the matter for further proceedings) because the parties did not raise the question of a departure from the existing rule and were content to litigate within its bounds.[4]

---

[4] In *State* v. *Deetz*, 66 Wis. 2d 1 (1974), the Wisconsin court, in turning to the rule of reasonable use, said it would apply only to future conduct, with the exception that it would also govern the appeal under review. The change of doctrine, however, had been argued to the court. See *Diaz* v. *Eli Lilly & Co.*, 364 Mass. 153, 167 (1973). Various other courts in adopting the new standard have not adverted to the question of retroactivity.