van Gestel, J.
This matter came before the Court for a juxy-waived trial on the merits against: Susie B. Murphy, Executrix of the Estate of William F. Murphy, Jr.; Joan E. Murphy, Executrix of the Estate of John T. Murphy, aka John F. Murphy; and Mary E. Quinn, as a third-party defendant.[2] Findings of fact, rulings of law and an order for judgment as to the parties that remain follow.
FINDINGS OF FACT
In June of 1975, the plaintiff, Mirra Realty Trust (“Mirra”), a Massachusetts trust in the business, among others, of acquiring and developing real property for commercial purposes, took title to approximately 4.28 acres of land on and near Salem Street in Woburn, Massachusetts (hereafter “the Mirra property”). Nearly all of the Mirra property, except for an entranceway (“the entranceway”) roughly 250’ long by 30’ wide, was located behind property of others fronting on Salem Street. The property abutting the full length of the westerly side of the entranceway and roughly 240’ along the northerly boundary of the Mirra property was, and is, owned at various times by one or the other of the defendants or their predecessors in interest. (This property will, for convenience only, be hereafter called “the Murphy property.”)
In late 1975, Mirra began the first phase of its development of the Mirra property. This consisted of bringing in utilities — water, gas, electric and sewer— on the entranceway, with attendant trenches, piping and back filling. There were no apparent problems with the soil on the entranceway, although no scientific testing was performed. After some further site work, including the introduction of some off-site fill, Mirra, in 1979, constructed and leased out a 10,000-square-foot commercial building.
In 1984, Mirra extended the building by adding an additional 5,000 square feet of commercial space.
In 1988, Mirra proposed a final 24,000-square-foot addition to its Salem Street building at the easterly end of the Mirra property. In connection with the financing for this addition, a G.L.c. 21E environmental study was required. Goldberg-Zoino & Associates, Inc. (“GZA”) was engaged by Mirra to perform the site assessment. That work, described as being for “real estate transaction purposes only and ... not intended to meet all of the criteria of a Massachusetts Contingency Plan . . . Phase One Study,” was completed in September 1989. Among other things, GZA concluded that:
Data indicated the presence of 1,2-dichloroethene in groundwater ... at concentration of about 0.18 ppm. PHC [petroleum hydrocarbon] analyses indicated the presence of No. 2 fuel oil and lubricating oil in groundwater ... at concentration of about 250 ppm, and a rather complex mixture of PHCs including xylenes in soil ... at about 2000 ppm. Based on these data, and on the observations made and information reviewed ... , it is GZA’s opinion *17 that, within the meaning of Massachusetts General Laws Chapter 2 IE, hazardous material and oil were present within the groundwater and soil at the site during the time of evaluation.
GZA suggested that “the probable source of the observed PHC contamination in the soil and groundwater at boring GZ-5[3] is the residence and garage property abutting the north of the site.” This would be the Murphy property.
GZA also noted that the source of observed 1,2-dichloroethene in the groundwater at monitoring well GZ-4[4] “is unknown.” GZA observes, however, that given that “degreasers and drums of solvent were observed in the buildings on-site [i.e., the Mirra property], an on-site source cannot be ruled out.”
It is to be noted that both the Mirra property and the Murphy property are located in a highly industrial area and in the midst of a significant and notorious regional contamination problem. Woburn Wells G and H, made nationally infamous by Jonathan Hari’s book “A Civil Action” and the recently released movie of the same title, are located just 2000’ to the northeast of the sites.
In the fall of 1993, Subsurface remediation Technologies (“SRT”) conducted tests and performed a preliminary subsurface investigation and characterization of risks at the Murphy property. SRT’s December 1993 Report concluded that oils and hazardous materials as defined in G.L.c. 2 IE were detected on the Murphy property in greater than applicable Massachusetts DEP reportable concentrations and soil and groundwater standards. SRT noted that the “soil and groundwater contamination on the Murphy [p]roperty poses a potential for significant risk to health, safety, public welfare, and the environment and requires remedial actions.”
SRT reached the following conclusions:
Based upon groundwater flow data presented it is probable that the oil and hazardous materials found on the Murphy [property have migrated with groundwater to abutting properties [including the Mirra property]. However, significant migration of free product and dissolved oils and hazardous materials is not expected. The downgradient and areal extent of oil and hazardous materials from the Murphy [p]roperty in the soil and groundwater has not been delineated. Based on past/historic use of the site with its apparent past releases and the low flow gradients demonstrated in this investigation, further significant off-site migration is unlikely and most likely will be contained within the area shown on Figure 8.[5]
The Murphy property contains a house and a garage. The garage, as of December 1993, was not being used for commercial purposes. The garage had previously been used as part of a waste oil/transfer operation. When in operation, trucks would unload oils into a distribution pit in the northeast corner of the garage. Prior to 1976, oil was transferred from the distribution pit through pipes to storage tanks located on the eastern portion of the property. This distribution pit was discontinued in 1976.
Six underground storage tanks, two concrete storage bunkers, one above-ground tank, and one above-ground fuel storage tank in the basement of the house are present on the Murphy property. Four of these storage units were used by the waste oil and oil storage/transfer operation. Prior to 1983, one of the tanks contained gasoline to fuel the trucks.
The liquid contents of the tanks on the Murphy property were removed in the early 1990s.
The ownership history of the Murphy property insofar as this case is concerned begins in 1961 with the acquisition of the property by Norman H. Quinn and Mary E. Quinn. Norman H. Quinn died on May 5, 1976, after which the entire title to the property passed to his widow, Mary E. Quinn, the third-party defendant here.
On February 23, 1983, Mary E. Quinn conveyed the property to John F. Murphy. Mr. Murphy died on March 18, 1994. His interests are now represented as a defendant in this case by Joan F. Murphy, Executrix of the Estate of John T. Murphy, aka John F. Murphy.
Although he never owned the Murphy property, for a period of time from approximately 1968 to 1981, William F. Murphy, Jr. conducted a waste oil business — called “Bill Murphy Waste Oil” — on the property. William F. Murphy, Jr. died on February 19, 1996. His interests are now represented as a defendant in this case by Susie B. Murphy, Executrix of the Estate of William F. Murphy, Jr.
As a result of the discovery of contamination on the Mirra property, Mirra’s financing of the third phase of construction was delayed. Ultimately, the third phase was financed and constructed. To that extent, at least, whatever contamination may now be on the Mirra property does not appear to be affecting its highest and best use.
Mirra presented some evidence of claimed damages in the form of a damage analysis that it attributes to the delay in connection with the construction of the third phase. Its claimed net cash loss due to construction delays is $618,722. This is made up of claimed lost rental-related revenues of $650,590, less $431,868 of debt service during the delay period, equaling $218,722. To this amount Mirra adds $400,000, which it suggests is the increase in construction costs from a 1990 estimate to the 1996 actual costs.
RULINGS OF LAW
The Court begins its analysis and rulings of law by characterizing the status of the remaining defendants and the third-party defendant.
*18 William F. Murphy, Jr., whose estate is represented by Susie B. Murphy as executrix, was for a period of time from 1968 to some time in 1981 an operator of a waste oil business on the Murphy property.
From February 23, 1983, until his death in 1994, John F. Murphy was the owner of the Murphy property, which ownership passed to his widow, Joan E. Murphy. Joan Murphy was, therefore, the owner of the site at the time suit was brought.
The third-party defendant, Mary E. Quinn, was a prior owner of the Murphy property, having conveyed it to John F. Murphy in 1983.
The primary claims for relief against the Estate of John T. Murphy and the Estate of William E. Murphy, Jr. are grounded on G.L.c. 2IE. This chapter, in Sec. 5(a), sets out five categories of persons responsible for response costs incurred as the result of releases or threats of releases that constitute contamination. Griffith v. New England Tel. &, Tel. Co., 420 Mass. 365, 366 (1995); Marenghi v. Mobil Oil Corp., 420 Mass. 371, 372 (1995). Those five categories include: (1) the owner of a site from or at which there is or has been a release or threat of release of oil or hazardous material; (2) any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored and from which there is or has been a release or threat of release; (3) any person who arranged for the transportation, storage or treatment of hazardous materials to a site from or at which there is or has been a release or threat of release of hazardous material; (4) any person who transported any hazardous material to a site from which there is or has been a release or threat of release of such material; and (5) any person who otherwise caused or is legally responsible for a release or a threat of release of oil or hazardous materials from a site.
By statutory definition, the term “oil” does not include “waste oil.” See c. 2 IE, Sec. 1. Thus, of the five foregoing categories, numbers (2), (3) and (4) relate to hazardous wastes only, but not to oil.
As noted above in the findings of fact, both petroleum hydrocarbons (PHCs) and volatile organic compounds (“VHCs”) were found in the groundwater and in the soil on the Mirra property. There was, however, insufficient evidence upon which to make a determination as to whether the PHCs were the product of oil or waste oil. At the same time, there was some evidence that both PHCs and VOCs were found in the soil and the groundwater on the Murphy property, at least as of December 1993.
The evidence is equally clear that Mirra, neither objectively nor subjectively, was ever threatened by a release of oil or hazardous materials from the Murphy property. The existence of such materials beneath the surface in the soil or groundwater was only detected after the product of soil borings and test wells was subjected to sophisticated laboratory analysis. You cannot see this stuff. And even what was discovered did not permanently stop bank financing of the phase three project or its actual construction and occupation despite the fact that no work was performed for containment or removal of any oil or hazardous substance. On this record, no c. 2 IE liability for threatened contamination by oil or hazardous materials can be found.
There is suspicion that the contamination found on the Mirra property on the entranceway near the southeast comer of the Murphy property may have migrated from the Murphy property. What is not known, however, is when the migration — assuming that to be the case — occurred. There was some suggestion from the results of laboratory testing that the contamination began before 1980 due to the low flash point of the oil and the presence of PCBs, the latter of which have not been produced since 1977. And the low flash point equally dates the oil.
Further, given the generally contaminated nature of the East Woburn locus, it cannot be determined on the record before the Court whether the origin of the PHCs or the VOCs was the Murphy properly or some other upgradient or extraneous source.
Lastly, even Mirra’s expert postulated that at least some of the contamination on its property may have come from spills occurring there.
If, like William F. Murphy, Jr. or Mary E. Quinn, the defendant charged was not a present owner or operator of the site, the plaintiff had the burden of demonstrating that the defendant charged either caused or was legally responsible for the contamination that reached the Mirra property. Griffith, supra, 420 Mass. at 367. “(AJctual proof of causation is needed, rather than mere evidence of site operation or ownership." Id. at 369. There is, thus, no evidence on which such a finding can be made against William F. Murphy, Jr. or Mary E. Quinn. Consequently, the c. 2IE claims against the Estate of William F. Murphy, Jr., and the third-parly claims on the same basis against Maiy E. Quinn, must be dismissed.
There are similar weaknesses in proof with regard to the c. 2IE claims against the Estate of John T. Murphy. There is no evidence of when the contamination arrived on the Mirra property — assuming that it came from the Murphy property — and little more than scientifically worded speculation as to where it came from. Indeed, the plaintiffs own experts dramatically disagreed as to the direction of groundwater flow in the vicinity of the confluence of the Mirra and Murphy properties.
Whatever burden may rest upon the shoulders of present owners of sites, a plaintiff must at least meet a burden of proving that the contamination came from the property owned and when the properly was owned by the charged defendant. There is not enough on either point here to impose liability under c. 2 IE against the Estate of John T. Murphy.
*19 To this Court there is another gap in the evidence that bars relief under c. 21E, Sec. 5 against any of the defendants. The statute provides relief “to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release.” In this case the plaintiff must show damage to his real property as a result of a release of oil or hazardous material. He has not done so.
As a general rule, damage to real property is measured by the diminution in the market value of the property, if any, caused by the contamination. Trinity Church v. John Hancock Mutual Life Ins. Co., 399 Mass. 433, 48 (1987). If the damage is permanent, the measure is the difference in fair market value before and after the injury. Belkus v. Brockton, 282 Mass. 285, 287-88 (1933). If the injury is reasonably curable by repairs, then the expense of the repairs, if less than the diminution in value, is the measure. Howe v. DiPierro Mfg. Co., Inc., 1 Mass.App.Ct. 81, 86 (1973).
Here, there was no evidence of diminution of value of the Mirra property, nor was there any remediation of the contamination. Indeed, both financing and construction went forward despite the contamination, whatever its source. There is no cause of action under c. 21E permitting recovery for economic loss not directly resulting from environmental damage. Garweth Corp. v. Boston Edison Co., 415 Mass. 303, 306-08 (1993).
The remaining claims against the defendants are predicated upon common law theories of negligence, trespass and nuisance. Each requires the plaintiff to meet a burden of proving that one of the charged defendants was negligent or caused the trespass or nuisance.
Negligence requires proof that a defendant failed to act in a reasonably prudent manner in all of the circumstances. Gilhooley v. Star Market Co., Inc., 400 Mass. 205, 207 (1987).
Trespass needs proof of a negligent entry onto the plaintiff
s land, causing harm. DeSantis v. Lynn Water and Sewer Commission, 423 Mass. 112, 118 (1996).
Nuisance is when aproperty owner creates, permits or maintains a condition or activity on his property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another. Murphy v. Town of Chatham, 41 Mass.App.Ct. 821, 823 (1996).
Each of the forgoing require proof of when, how and by whom the claimed damages were caused. But there is insufficient evidence to support any rulings against any of the defendants on any of the negligence, trespass or nuisance theories. In the absence of information as to when and what happened, and who owned or was in charge of the Murphy property at whatever that time may have been, there can be no findings of negligence, trespass or nuisance against any of the remaining defendants.
For the various reasons set forth above, the Court orders judgment in favor of all defendants dismissing all claims against them and dismissing all third-party claims.

 The plaintiff, at the opening of the trial, voluntarily dismissed the claims against William F. Murphy, III. Earlier, in the long history of this case, voluntary dismissals were filed as to the claims against The Learning Center for the Deaf, The Genesis Fund, St. John of God Hospital for Special Children and Jill MacLeod.

 This is a boring at a point on the Mirra property closest (just a few feet away) to the southeasterly comer of the Murphy property.

 This is a monitoring well near the southerly border of the Mirra property, easterly of the building as constructed in 1989. It is estimated to be nearly 200’ from the nearest point of the Murphy property.

 Figure 8 depicts an area mostly on the Murphy property, with some migration shown in a northeasterly direction across the entranceway to the Mirra property, and very minor incursions over the northerly property line of the Mirra property.