**Steve ARGYELAN and Anna Argyelan, Appellants (Defendants Below),**

v.

**Harold HAVILAND and Maxine Haviland, Appellees (Plaintiffs Below).**

No. 682S208.

Supreme Court of Indiana.

June 3, 1982.

R. Victor Stivers & Associates, Indianapolis, for appellants.

Burton, Lamey & Jensen, Indianapolis, for appellees.

PRENTICE, Justice.

This cause is before us upon the petition of the plaintiffs (appellees) to transfer the cause from the Court of Appeals, Second District, which Court reversed the judgment of the Circuit Court of Marion County awarding damages, but withholding injunctive relief, against Defendants for unlawfully discharging surface water run-off upon the land of Plaintiffs.

The opinion of the Court of Appeals, Second District, correctly followed ruling precedents of this Court; but such ruling precedents appear to be in need of clarification, as evidenced by the opinion of the Court of Appeals, Third District, in the cause entitled *Rounds, et al. v. Hoelscher,* (1981) handed down December 10, 1981 and published at 428 N.E.2d 1308. In the case at bar, the Court for the Second District correctly recognized and applied the "Common Enemy Rule," whereas the Court for the Third District failed to recognize said rule as the established and prevailing rule and purported to establish as the law of this state that which has come to be known in other jurisdictions as the "Rule of Reasonable Use."

In order to reconcile said conflict, we now grant the petition to transfer, and the decision and opinion of the Court of Appeals, Second District, which appears at 418 N.E.2d 569 is hereby vacated; although the judgment of the trial court is, nevertheless, reversed, because the evidence presented is insufficient to sustain it.

## FACTS

The facts of the instant case are not in material dispute. Plaintiffs are the owners of a residential lot improved with a house and two outbuildings. The lot fronts on Auburn Street and faces west. The defendants own a commercial lot which is "L" shaped. The top of the "L" abuts Washington Street, an East-West thoroughfare; the leg abuts Auburn Street, a North-South Street, and the foot is adjacent to, north of and extends the full depth of Plaintiffs' lot.

The elevation of Washington Street is higher than the land of Plaintiffs and Defendants. Surface water drains from Washington Street into Auburn Street and flows southwardly for approximately 1000 feet to a small creek or public drainage ditch. Auburn Street has no ditches or storm sewers, the fall is gentle, and the surface water sometimes overflows into the adjacent yards.

The side of Plaintiffs' lot adjacent to Defendants' lot is its low side, and the lowest point of the lot is at its rear (the easterly end). It is not clear whether the natural drainage of Plaintiffs and Defendants lots prior to Defendants making the alterations hereinafter mentioned, was onto Plaintiffs' lot or onto Defendants' lot. Plaintiff, Mrs. Haviland, testified that prior to Defendants improving their lot, she had never seen surface water drain from the Defendants' lot onto their own and that no consequential amount of surface water had, therefore, puddled or accumulated upon their lot. For purposes of this opinion, therefore, we adopt the view that Defendants' lot was no higher if, in fact, as high as that of the Plaintiffs.

Prior to 1970, Defendants' lot was covered with grass and trees. In 1971, Defendants erected a commercial building on that portion of their lot adjacent to Washington Street; and in 1974, they built another commercial building along the foot of the "L" adjacent to and twenty (20) feet north of the plaintiffs' north line. They also paved, for parking, that portion of the lot not built upon, except for the twenty foot strip adjacent to the plaintiffs' north line. Some fill was used around the building; and, although it is not clear, it appears that Defendants also used substantial fill along the foot of the "L", increasing it as it extended to the toe.

The roof of the more recently constructed of Defendants' buildings is drained by means of three downspouts on the south side of the building. Two of these downspouts empty onto splash blocks at the corners of the building. The third one drains into an underground pipe which carries the water eastwardly to a point twenty feet north of the dividing line and fifty feet west of Plaintiffs' east line, if extended.

Following completion of Defendants' aforementioned improvements, Plaintiffs complained that surface water was draining from Defendants' property onto their property, pooling there and causing substantial damage. Defendants then erected a concrete curbing approximately one foot north of Plaintiffs' north line and extending approximately six inches above the finished grade of Defendants' lot. On the south side, i.e., the plaintiffs' side, the curbing extends approximately eight inches above grade at the west or Auburn Street end and approximately two feet above grade at the east end.

Erection of the curbing, if it alleviated the plaintiffs' surface problem, did not eliminate it. There was testimony that in a sustained rain, water would accumulate behind the curb but eventually flow over it.

Historically, two diametrically opposed but clear rules were consistently followed in the various states with respect to surface water, which must be distinguished from water flowing, even if not continuously, through established and defined channels. Through extensive modifications of both rules, a third doctrine emerged and has been adopted in approximately twenty of the states. These rules, their development and their application are extensively treated and annotated at 93 A.L.R.3d 1193 et seq.

In its most simplistic and pure form the rule known as the "common enemy doctrine," declares that surface water which does not flow in defined channels is a common enemy and that each landowner may deal with it in such manner as best suits his own convenience. Such sanctioned dealings include walling it out, walling it in and diverting or accelerating its flow by any means whatever.

The "civil law" doctrine, on the other hand, proscribes interfering with or altering the flow of surface water.

Both doctrines are harsh but have the common virtue of predictability. Under them, landowners know where they stand. They know what they may do and what they may not do without incurring severe risks. If at times the doctrines work to one's disadvantage, there are other times when he reaps its benefits.

Because of the harshness of both of these rules, various exceptions and limitations have been engrafted upon them in all jurisdictions of the United States. A substantial number of states have permitted but minor modifications, and in such jurisdictions the doctrines are still generally referred to as the "common law doctrine" and the "civil law doctrine," notwithstanding such modifications.

Other jurisdictions, approximately twenty in number, have evolved to or adopted by express design the aforementioned third doctrine now referred to as the "Rule of Reasonable Use."

"The reasonable use rule was apparently first adopted in New Hampshire. Noting the inconvenience which would arise from adopting extreme rules that a landowner has either no right of drainage or an absolute right, the court in *Bassett v. Salisbury Mfg. Co.* (1862) 43 N.H. 569 (which was apparently primarily concerned with percolating waters), said that the sole ground of qualification of the landowner's right of drainage was the similar rights of others, the extent of the qualification being determined under the rule of reasonable use, and the rights of each landowner being similar and his enjoyment dependent upon the action of the other landowners, so that the rights must be valueless unless exercised with reference to each other. * * *" 93 A.L.R.3d 1193 at 1216.

The common enemy and civil law rules are grounded upon real property concepts. The modifications engrafted upon them re-

sulted from the use of tort law concepts used to mitigate the harsh results of the property law doctrines. The doctrine of "reasonable use," however, goes much further and focuses upon the results of the action and the consequent interference with another's use of his land. Its advantage is flexibility. Its disadvantage, obviously is its unpredictability.

Although Indiana doubtlessly would not permit a malicious or wanton employment of one's drainage rights under the common enemy doctrine, it appears that the only limitation upon such rights that we have thus far judicially recognized is that one may not collect or concentrate surface water and cast it, in a body, upon his neighbor. *Cloverleaf Farms, Inc. v. Surratt*, (1976) 169 Ind.App. 554, 349 N.E.2d 731 and cases there cited, *Gene B. Glick Co., Inc. v. Marion Construction Corp.*, (1975) 165 Ind. App. 72, 331 N.E.2d 26, *reh. denied*, 165 Ind.App. 72, 333 N.E.2d 140 and cases there cited.

Plaintiffs acknowledge the rule in Indiana to be as hereinbefore stated. They appear to argue, however, that by a combination of erecting downspouts directed towards the property·line, paving a substantial portion of their land and erecting the aforementioned curb or retaining wall along the property line, the defendants somehow exceed the limits of what is permissible in fending off the surface water. It requires no reweighing of the evidence to determine that the evidence does not bear them out. There is simply no evidence that any surface water was ever channeled from Defendants' land onto that of the plaintiffs or cast in a body upon them.

Under the common enemy doctrine, it is not unlawful to accelerate or increase the flow of surface water by limiting or eliminating ground absorption or changing the grade of the land. These two things, we may concede, are shown by the evidence to have resulted from Defendants' improvements. However, the only evidence that water from the defendants' premises entered those of the plaintiffs' was testimony that, on occasions following sustained

moderate to heavy rains, the water built up behind the wall and overflowed it. There was no showing whatever that the defendants, conducted the water "by new channels in unusual quantities onto particular parts of the lower field" as in *Templeton v. Voshloe*, (1880) 72 Ind. 134 or collected the water in a volume and cast it, as in *Davis v. City of Crawfordsville*, (1888) 119 Ind. 1, 21 N.E. 449 and in *Patoka Township et al v. Hopkins*, (1891) 131 Ind. 142, 30 N.E. 896, or "shed the water from their building so as to *throw* it upon the appellant's lot." (Emphasis added) as in *Conner v. Woodfill et al*, (1890) 126 Ind. 85, 25 N.E. 876.

We do not intimate, as Plaintiffs' erroneously infer that the Court of Appeals did, that a distinction can be drawn between the case before us and the *Conner* case upon the basis that Defendants' downspouts are situated twenty feet from the property line whereas in *Conner* they were but eight feet removed. The distinction lies in the character of the flow as it entered the adjoining property. That water was once impounded or channeled can be of no moment if it is diffused to a general flow at the point of entering the adjoining land.

Except as modified by the above cited cases and others holding that one may not, by artificial means throw or cast surface water upon his neighbor in unusual quantities so as to amplify the force at a given point or points, the law of this state remains as hereinafter quoted by this Court in *Taylor, Administrator v. Fickas*, (1878) 64 Ind. 167 at 173.

" 'The right of an owner of land to occupy and improve it in such manner and for such purposes as he may see fit, either by changing the surface or the erection of buildings or other structures thereon, is not restricted or modified by the fact that his own land is so situated with reference to that of adjoining owner that an alteration in the mode of its improvement or occupation in any portion of it will cause water, which may accumulate thereon by rains and snows falling on its surface, or flowing onto it over the surface of adjacent lots, either to

stand in unusual quantities on other adjacent lands, or pass into or over the same in greater quantities or in other directions than they were accustomed to flow.' "

"Again, from the same cause:

" 'The obstruction of surface water or an alteration in the flow of it affords no cause of action in behalf of a person who may suffer loss or detriment therefrom against one who does no act inconsistent with the due exercise of dominion over his own soil.' "

Since this case was decided by the Court of Appeals, Second District, the Third District of that Court has handed down its decision in *Rounds et al v. Hoelscher*, (1981) Ind., 428 N.E.2d 1308. That court failed to recognize the prohibition against channeling surface water upon one's lower neighbor at particular point or points as a limiting exception to the common enemy rule, as it has been clearly recognized by this Court for more than a century and, instead, referred to the cases that invoked it as applications of the civil rule. From this incorrect premise, it concluded that the civil rule had been applied with respect to altering or increasing the flow upon lower lands, while the common enemy doctrine had been applied in cases where lower owners had caused unwanted water to be diverted or impounded upon upper owners by means of dams or levees. The majority then purported to *settle* that which had, theretofore, been clear. It declared the rule of this jurisdiction to be the Rule of Reasonable Use and enumerated seven non-exclusive considerations to be employed in the determination of what uses are reasonable.

Judge Hoffman, concurring in the result in *Rounds, supra*, correctly noted that the case law in this area was not unsettled and that the majority had ignored stare decisis. "I cannot agree," he wrote, "that this court should in any respect presume to be a barometer of public opinion or the weathervane of social change. It is for the Legislature to establish the procedures for such change. The function of the Court of Appeals is to interpret the law and lay down

general guidelines by which the lawyers and the trial courts of the State may make determinations upon which they can depend. This function cannot be fulfilled by summarily abandoning the common enemy rule and replacing it with a rule of reasonableness. No longer will lawyers be able to advise their clients with any degree of certainty. What may be reasonable to one person in the use of his property may be unreasonable to an adjacent landowner. Neither of these opinions may comport with what a trial judge might declare is reasonable. *The majority opinion does nothing more than muddy the waters in this area of the law.*" (Emphasis added) 428 N.E.2d at 1318.

To Judge Hoffman's comments we add that although the Common Enemy Doctrine may, at times, inflict hardships, it is as fair to one as it is to another—a guiding precept of the law. Additionally, it has worked satisfactorily in this State from the beginning, and it is well understood. There has been no change in the forces that cause water to run down hill since the problems caused thereby were first considered and resolved in this State; and there is no basis for assuming that a change in the rules for coping with such problems would, over-all, reduce their number or make them any more palatable.

Although courts should not be slow to respond to changing conditions, changes in the established law are not warranted simply because it is imperfect, and we should not feel compelled to join the ranks of greater numbers when it has not been demonstrated that their way is the better way.

We recognize no need to take the advantage, which must repose somewhere, away from the owner at the top of the hill simply to give it to the owner who was the first in the watershed to develop his land, or to the owner who has friends in high places or can engender the greater sympathy for his plight. Neither are we disposed to make drainage commissions of our already overburdened trial courts. These, we perceive to be some of the latent drawbacks to the so-called Rule of Reasonable Use. We,

therefore, expressly disapprove the holding in *Rounds, supra*, to the extent that it purports to change the surface water law of this State.

Transfer is granted. The decision of the Court of Appeals, Second District, is vacated, and the judgment of the trial court is reversed.

DeBRULER and PIVARNIK, JJ., concur.

HUNTER, J., dissents with opinion in which GIVAN, C. J., concurs.

HUNTER, Justice, dissenting.

I must respectfully dissent from the majority opinion, although I wholeheartedly agree that the Havilands' petition to transfer should be granted. Unlike the majority, however, I would address that petition on its merits, reverse and vacate the decision of the Second District Court of Appeals found at *Argyelan v. Haviland*, (1981) Ind. App., 418 N.E.2d 569 (Sullivan, J., dissenting), and reinstate the judgment and $7,500 in damages which the trial court awarded the Havilands.

As it is, this jurisdiction is today presented with a rule of law and result so inimical to any sense of justice, be it lay or legal, that it offends our system of jurisprudence. Lest the legal and factual nuances involved in this cause obscure the import of the majority's decision, its ramifications for the homeowners of this state should be recognized from the outset. In its simplest terms, the majority of this Court has held that a landowner, in seeking to use property for a commercial purpose, may so alter the ground surface and natural drainage pattern that an adjacent landowner's existing usage of his property for residential purposes is rendered impossible by virtue of the resultant accumulation and run-off of surface water.

That is a proposition out of step with time and judicial logic, one which, as the majority tacitly concedes, is not and would not be followed by any other jurisdiction in this nation. Our law of surface water is today reduced to the rule of the jungle, where "might makes right" and the race

belongs to the person who is last in time, elevates his land the highest, and paves the greater portion of his lot surface. It requires no resort to hyperbole to recognize that the ramifications for the homeowners of this state are unconscionable. For that reason, the majority's opinion warrants an exacting scrutiny.

Its analysis of the evidence violates the standard of review incumbent upon this Court as an appellate tribunal. Its ruling of law is the product of semantics and meaningless distinctions, rather than logic. In addition, the majority bases its holding on an incomplete analysis of this and other jurisdictions' law of surface water, as well as a failure to analyze the historical development and policy considerations surrounding the common enemy doctrine. Equally as significant, the majority has failed to consider relevant statutory authority and has suggested that our courts are not open for the resolution of disputes of the factual nature present. It is for all these reasons that I believe errors pervade the majority opinion.

To understand and appreciate the import of the court's holding today, it is necessary to begin with an examination of all the evidence before us concerning the dispute between the Havilands, as plaintiffs, and the Argyelans, as defendants. In our review of the judgment awarded the Havilands at the trial court level, this Court, as an appellate tribunal, is required to refrain from weighing the evidence or judging the credibility of witnesses. It is our duty to consider only that evidence which is favorable to the prevailing party, together with all reasonable inferences which may be drawn therefrom. If, from that viewpoint, there is evidence of probative value to sustain the judgment of the finder of fact, the conclusion will not be disturbed. *Meehan v. Meehan*, (1981) Ind., 425 N.E.2d 157; *Indiana & Michigan Electric Company v. Schnuck*, (1973) 260 Ind. 632, 298 N.E.2d 436; *In re Adoption of Jackson*, (1972) 257 Ind. 588, 277 N.E.2d 162; *Mutual Benefit Health & Acc. Assn. v. Keiser*, (1938) 214 Ind. 472, 14 N.E.2d 707; *Oxendine v. Public*

*Service Co. of Ind., Inc.,* (1980) Ind.App., 423 N.E.2d 612.

This Court has recognized that it is not our prerogative to apply the above standard on an *ad hoc* basis; we have acknowledged that we cannot violate its precepts even though we might have reached a different conclusion had we been the trier of fact. *Meehan v. Meehan, supra.*

Because the majority has provided an incomplete view of the relevant facts, the details of the dispute must be summarized; because the majority has disregarded the standard of review, citations to the transcript of the evidence are also included.

In 1948, Harold and Maxine Haviland purchased a lot and home at 807 South Auburn Street in Indianapolis, Indiana. At that time, their northern property line adjoined a two-lot parcel occupied by a large two-story house. Apparently, that house was eventually razed; by 1970, the tract adjoining the Havilands' property bore only grass and a stand of trees. The lot immediately adjacent to the Havilands' property remained zoned for residential usage. The second and northernmost of the lots, located at the intersection of South Auburn and West Washington Streets, was zoned for commercial usage. (Tr. pp. 106–8.)

Meanwhile, the Havilands passed the years in relative equanimity, enjoying the not uncommon habits of homeowners. In 1954, the couple built a garage to supplement the utility shed and small frame house on their property. (Tr. p. 131, 1. 14.) Maxine dabbled in the antique business; the couple eventually devoted their garage to storage of personal items and Maxine's antique inventory. (Tr. p. 173, 11. 13–18.) The pet cats of the Havilands enjoyed the run of the utility shed. (Tr. p. 174, 11. 3–6.)

Each summer the Havilands planted and maintained a garden. Through Maxine's efforts at canning and freezing the produce, it proved a bountiful year-round source for the Haviland dinner table, as well as an enjoyable pastime. While Harold mowed and maintained the lawn, Maxine tended to her hobby of cultivating roses in and about the garden area. (Tr. p. 175, 11. 2–13; Tr. p. 176, 11. 15–21.)

Then, in 1970, the two undeveloped lots to the north of the Havilands were purchased by Steve Argyelan. Through his efforts, the lot adjacent to the Havilands' property was rezoned from a residential to a business classification. (Tr. p. 186, 11. 17–21.) By 1974, Argyelan had constructed two large commercial buildings on his property. (Tr. p. 186, 11. 22–26.) In constructing the buildings, he removed all trees and grass and raised the level of his lots two to three feet with fill dirt and crushed stone. (Tr. p. 107, 1. 27; Tr. p. 161, 11. 21–22; Tr. p. 180, 11. 14–15; Tr. p. 187, 11. 18–24; Tr. p. 203, 11. 5–10.) Argyelan then paved the vast portion of the two-acre ground surface not occupied by the business structures. (Tr. p. 203, 11. 11–14; Tr. p. 180, 11. 14–18.)

It is uncontradicted that prior to Argyelan's alterations of his property, the Havilands had no problem with flooding or standing water on their property. (Tr. p. 161, 11–18–20; Tr. p. 180, 11. 14–23.) Both the Havilands and Argyelan acknowledged that when grass and trees occupied the two-acre parcel, the tract absorbed the surface water which fell upon it; it was agreed that Argyelan's alterations virtually eliminated the capacity of the parcel to absorb water. (Tr. p. 146, 11. 16–20; Tr. p. 180, 11. 8–15; Tr. p. 209, 11. 19–20.)

In the spring of 1975, the Havilands began to experience severe drainage problems on a regular basis; standing water became a commonplace event, occurring after every moderate rainfall. Harold Haviland testified that a rainfall of one-half inch would precipitate a stand of water on their property. (Tr. p. 123, 11. 8–10.) Maxine Haviland stated that "very little" rainfall would trigger a recurrence of the standing water. (Tr. p. 173, 1. 5.)

The water, which would commonly stand for periods up to twenty-four hours, oftentimes measured three to four inches in depth both in and about the Havilands' garage and utility shed, as was evidenced by testimony and photographs. (Tr. pp. 120–127.) The accumulation also regularly

submerged the Havilands' garden area and portions of their driveway. (Tr. pp. 120–130.) To protect their garage and its contents, it became customary for the Havilands to battle the encroaching water with brooms during and after rainfalls. (Tr. p. 130, 11. 19–27.)

They complained to Argyelan, who then constructed a concrete wall along the common boundary line. (Tr. p. 149, 11. 10–18.) The height of the wall, which was intended to retain the run-off, was four to five inches above Argyelan's lot surface. (Tr. p. 190, 11. 10–12.) The majority implies that the wall may have "alleviated" the flooding problem endured by the Havilands. *Majority Opinion, supra.* There is no evidence to that effect. Mrs. Haviland testified that the wall "done us no good whatsoever" and answered "No" when asked: "It [the wall] didn't alleviate the problem?" (Tr. p. 171, 11. 17–20.)

It is uncontradicted that the wall had no effect on the flooding; testimony established that the water simply backs up against the wall until it reaches the top, then cascades over it "like a waterfall." (Tr. p. 118, 11. 19–26; Tr. p. 171, 11. 16–23.) The majority suggests that the accumulation occurs only in "sustained" rainfalls; the evidence favorable to the judgment does not support that statement, for both Havilands indicated the flooding occurs with very little rainfall—as little as one-half inch. (Tr. p. 123, 11. 8–10; Tr. p. 173, 1. 5.)

In the spring of 1976, still plagued by the flooding, the Havilands initiated this action against Argyelan and his wife, as owners of the adjacent property. In their complaint, they sought damages suffered by reason of the repeated instances of standing water, which they alleged were caused by Argye-

lan's alterations of the property and its ground surface.

The case was tried without a jury. Extensive evidence was presented with respect to the natural drainage flow in the area, the nature and effect of Argyelan's construction and ground surface alterations, and the events heretofore described.[1] Testimony also revealed that in spite of the Havilands' presence with brooms during and after rains to deflect the water from the garage, as well as the fact that Maxine eventually placed her antiques on stilts, approximately $700 to $800 worth of antique picture frames, dolls, and china were damaged by the repeated flooding. (Tr. p. 173, 1. 27.) The garage floor settled unevenly and cracked; photographs reveal the deleterious effects of water rot around the base of the wood frame garage, which was valued at approximately $3,500. (Tr. pp. 132–133.) Likewise, the utility shed, which was valued at $1,200, required a new floor; uneven settling had caused the roof line to tilt. (Tr. pp. 134–137.) Harold Haviland testified that the water had eroded the gravel driveway, necessitating the purchase of eight tons of gravel; the gravel, which was dumped by a truck driver and spread by the Havilands, cost $58. (Tr. pp. 143–144.) He also testified that the water had invaded the tires of his garden tractor; damage to the tires and wheels was estimated at $200 to $300. (Tr. pp. 144–145.)

In addition, evidence established that the continual flooding had forced the Havilands to abandon their annual garden; Harold testified that the ground was green from a pervasive mold and simply would not grow anything. The value of the lost produce annually was estimated at $300 to $400. (Tr. pp. 137–138; Tr. p. 175.) Due to the standing water, Maxine's roses were ulti-

---

1. The majority of the Court of Appeals also observed that the evidence revealed the following:

   "Because of a generalized drainage problem in the neighborhood, the City of Indianapolis offered to meet with residents to discuss construction of a drainage ditch. Apparently the meeting was never held due to lack of interest." 418 N.E.2d at 571.

   Consistent with our standard of review, which requires us to examine all the evidence most favorable to the judgment, the record reveals it was not "due to lack of interest" on the part of the Havilands that the meeting was not held. Maxine testified she talked to neighbors about the city's offer, but they were not interested because they did not have water standing in their yards.

mately destroyed and the plants were removed. (Tr. p. 176, 11. 15–27.) Only the Havilands' cats benefited from the standing water; they enjoyed the run of the house whenever the flood routed them from the utility shed. (Tr. p. 174, 11. 6–10.)

Finally, the Havilands acknowledged that the surface water problems plaguing their property had deprived them of their hobbies—gardening and yard work—and in turn diminished their enthusiasm for their property as a domicile. (Tr. pp. 174–178.) Maxine indicated it was difficult to take vacations together, lest another deluge further damage possessions stored in the garage and utility shed. (Tr. p. 174, 11. 4–8.) She opined that the repeated flooding of the property had reduced its marketability; at the same time, she indicated it would cost $30,000 to $35,000 for the couple to move to a house similar to their residence at 807 South Auburn. (Tr. p. 177, 1. 20.)

Based on this evidence, the trial court found for the Havilands and awarded them $7,500 in damages; the court denied, however, the Havilands' prayer for injunctive relief. Steve and Anna Argyelan then appealed.

The Second District Court of Appeals reversed the judgment of the trial court, concluding:

"Because there is no evidence in the record that the Argyelans engaged in the positive, tortious, wrong of collecting surface water and discharging it in a *concentrated* flow upon the land of their neighbors, the Havilands, the 'common enemy rule' prevails and the decision of the trial court must be reversed." *Argyelan v. Haviland, supra*, at 575 (emphasis original).

Judge Sullivan dissented on the bases that the majority had disregarded particular facts, misapplied case precedent, and mis-

construed the "common enemy rule" which governs "surface water" in Indiana. *Id.* at 575–576.

The Havilands then petitioned this Court to reverse the decision of the Second District Court of Appeals and reinstate the judgment of the trial court. The Havilands maintained the Court of Appeals had violated the standard of review it was required to apply[2] and that the Court of Appeals had contravened this Court's decision in *Conner v. Woodfill*, (1890) 126 Ind. 85, 25 N.E. 876.

While the Havilands' petition was pending before this Court, our Third District Court of Appeals was confronting surface water disputes which, both in legal principles and factual considerations, bore on the Havilands' claim. In *Rounds v. Hoelscher*, (1981) Ind.App. 428 N.E.2d 1308 (Hoffman, P. J., concurring in result), Judge Garrard engaged in a lengthy and well-documented analysis of the three doctrines employed in the law of surface water; ultimately, for reasons discussed hereinafter, the majority of the Third District concluded that the common enemy doctrine should be abandoned as simply too extreme to warrant continued application. *Id.; see also, Gilmer v. Board of Com'rs of Marshall County*, (1981) Ind.App., 428 N.E.2d 1318 (Hoffman, P. J., concurring in result).

Confronted with this conflict between our appellate districts, the majority of this Court today rules that this state's law of surface water should be governed by pronouncements rendered 104 years ago in *Taylor, Administrator v. Fickas*, (1878) 64 Ind. 167. In quoting *Fickas*, the majority holds that a landowner may alter his property in a manner which causes surface water to stand in "unusual quantities" upon his neighbor's land. Only one limitation is expressly recognized:[3] a landowner "may

---

**2.** Clearly, there is merit in the Havilands' contention, as recognized by Judge Sullivan, that the majority of the Court of Appeals did violate the standard of review. *See, e.g.*, n.1, *supra*. The majority of the Court of Appeals indicated the wall "protected the Havilands' property." *Argyelan v. Haviland, supra*, at 574. Absolutely no evidence supports that conclusion. Like-

wise, the Court of Appeals failed to state that the wall was built only after the Havilands had complained to Argyelan, an ironic twist in light of the fact that the Court of Appeals found the presence of the wall dispositive.

**3.** The majority also suggests that "Indiana doubtlessly would not permit a malicious or wanton employment of one's drainage rights

not collect or concentrate surface water and cast it, in a body, upon his neighbor." *Majority Opinion, supra,* citing *Cloverleaf Farms, Inc. v. Surratt,* (1976) 169 Ind.App. 554, 349 N.E.2d 731, and *Gene B. Glick Co., Inc. v. Marion Construction Corp.,* (1975) 165 Ind.App. 72, 331 N.E.2d 26.

At first glance, the limitation recognized by the majority is superficially appealing and suggests that a certain degree of reasonableness is required of neighboring landowners with respect to surface waters. The majority's application of the limitation to the cause before us, however, reveals that the limitation is virtually meaningless and that the doctrinaire rule is, for all practical purposes, the sole rule.

The record indicates that the bulk of the water regularly plaguing the Havilands is surface water repelled from the roof of one of Argyelan's commercial structures. Photographs and testimony establish that the entire roof pitches gently to the south and drains toward the Havilands' property. The building's three downspouts are located on the south side of the building, the side toward the Havilands' property. Water repelled from the roof is channeled down through the spouts and onto Argyelan's ground surface. Twenty feet separate the base of the building from the Havilands' property line. That twenty-foot strip of land has a surface of crushed stone and slopes gently toward the Havilands' property. While the crushed stone permits some absorption of the water, the strip is apparently insufficient to handle the quantity of water it regularly bears; the testimony is uncontroverted that after moderate rainfalls, the water eventually backs up and cascades evenly over the top of the wall onto the Havilands' property.

Obviously, these facts suggest that even within the semantics of the limitation described by the majority of this Court, Argyelan violated his duty to the Havilands. He "collected" all surface water falling upon the roof of his business structure, "concentrated" it by virtue of the downspouts, and "cast" it toward the Havilands' property. There, it backed up against the four-inch high wall in a "body" and cascaded onto the Havilands' property.

Indeed, these facts would appear to bring this case within the parameters of *Conner v. Woodfill, supra.* In *Conner,* a church had been constructed with downspouts which discharged the water collected on one-half its roof toward Woodfill's property. The downspouts released the water eight feet from the common boundary line. From there, the water, *without any channels, ditches, or drainage tiles to guide its flow,* traversed Conner's property and flooded Woodfill's tract. This Court affirmed the judgment entered against Conner, stating:

"The rain-fall upon the building is shedded, as near as may be, one-half to the east and the other half to the west; at the southwest and northwest corners of the building are down spouts to receive and carry from the building the water which is shedded to the west side of said building; passing through these spouts to the ground the water passes off the appellees' lot and on the lot of the appellant, to his injury, etc.

"The appellees were trespassers whenever they shed the water from their building so as to throw it upon the appellant's lot." 126 Ind. at 86, 25 N.E. at 876.

*Conner* is consistent with the limitation recognized by the majority; inasmuch as no significant factual distinction exists between the cases, this cause would also ap-

---

under the common enemy doctrine ...." *Majority Opinion, supra.* It is semantic legerdemain to suggest a distinction between intentional acts and negligent ones in the context of surface water disputes. It requires no legal education to realize that drainage problems are rarely, if ever, the product of intent or malice; if such a case occurred, the intentional character would be blantantly manifested by a chan-

nel and so fall within the exception already recognized and defined in *Cloverleaf Farms, Inc. v. Surrat, supra.*

Our legislature has refuted the distinction in Ind.Code § 34–1–52–1 (Burns 1973), where it defined actions for interference with the use of property. The statute and its relevancy to the question before us is discussed within the context of this dissenting opinion, *infra.*

pear to warrant application of the limitation.

The majority, however, attempts to distinguish *Conner,* stating:

"We do not intimate, as Plaintiffs' erroneously infer that the Court of Appeals did, that a distinction can be drawn between the case before us and the *Conner* case upon the basis that Defendants' downspouts are situated twenty feet from the property line whereas in *Conner* they were but eight feet removed. The distinction lies in the character of the flow as it entered the adjoining property. That water was once impounded or channeled can be of no moment if it is diffused to a general flow at the point of entering the adjoining land." *Majority Opinion, supra.*

The majority does not explain what was the "character" of the "flow" involved in *Conner*; as here, the facts of *Conner* simply revealed that the water discharged from the downspouts, without ditches or channels to guide it, flowed toward the adjacent property.

The only factual distinction between *Conner* and the instant case, insofar as the "character" of the respective "flows" is concerned, is that here, a four-inch high wall, *which only temporarily impeded the water* on its way to the Havilands' property, provided a shelf for the water to cascade over "like a waterfall." In each case, however, the water entered the adjacent property "diffused to a general flow." *Majority Opinion,* as quoted, *supra.*

Perhaps the majority is basing its distinction on the fact that in *Conner,* this Court employed the word "throw" in disposing of the case. To seize upon the usage of the word "throw" would elevate semantics over substance in light of the fact that no ditches or channels were involved in *Conner*; the difference between "throwing" and not "throwing" water onto adjacent property would be dependent upon whether the flow was briefly impeded by a cement wall on its way to the adjacent property.

If that be the dispositive factor in determining liability in our law of surface water,

the Havilands can only rue the day when, rather than promptly filing suit, they complained to Argyelan and prompted his construction of the four-inch high wall which briefly impedes and diffuses the flow "like a waterfall." It is doubtful that the Havilands care whether the water enters their property in a channel or in a diffused state; it is certain that the Havilands will not understand why the three to four inches of standing water in and about their garage, tool shed, garden area, and driveway is "of no moment" because it enters their property "diffused to a general flow." *Majority Opinion, supra.*

Developers, however, may take comfort in the fact that they no longer need to foresee the surface water problems their work might cause adjacent residents. No longer will it be necessary to take customary precautions such as the installation of drainage tiles or catch basins, either of which would have provided a simple solution to the flooding foisted on the Havilands. All they need do to escape liability for surface water damage which their work causes adjacent residents is to build a wall at the common boundary line to briefly impede and diffuse the flow. With careful adherence to this "determinative" matter, developers may elevate their property, pave its surface, construct large buildings, and eliminate the capacity of the property to absorb water, with impunity and without fear of legal liability for any damage the resulting flooding may cause adjacent residents.

Like Judge Sullivan and the Third District Court of Appeals, I do not believe the case precedent of this jurisdiction supports that proposition and result. Rather than a rule which rests on semantics, this jurisdiction should recognize that when, as here and in *Conner,* a landowner's discharge of water unreasonably interferes with a property owner's prior and existing usage and enjoyment of his land, recovery should be permitted—as it was in *Conner.*

It is hardly appropriate that our surface water law requires homeowners such as the Havilands, who have a long-standing prop-

erty interest in their home and lot, not only to suffer the deluge of water, but also to share indirectly the expense of another's use of adjacent property for commercial gain. While the majority may suggest that a strict application of the common enemy doctrine "is as fair to one as it is to another" (*Majority Opinion, supra*), it should be recognized that it is rarely the *residential property owner* who so alters his property, either by the construction of large buildings or the installation of massive paved areas, that the absorption capacity of the land is virtually eliminated.

That is not to say that homeowners deserve any advantage on the basis of "sympathy." *Majority Opinion, supra.* Instead, it is to observe that there need be no "advantage," that an evenhanded approach to surface water disputes is available, and that a certain reasonableness must obtain in the results of surface water disputes. That was the focus and the spirit of the Third District's decision in *Rounds*.

The majority of this Court, of course, has "expressly disapproved" of the holding in *Rounds*. It is unfortunate that the majority has debunked *Rounds* without examining the considerations regarding the common enemy rule which prompted the decision and were fully discussed therein.

It is true that "changes in the established law" are not *necessarily* warranted simply because it is imperfect. *Majority Opinion, supra. Stare decisis* warrants healthy respect as a cornerstone of our jurisprudence. Prior to today, however, the law at issue can hardly be described as "established" or "well understood," in view of the three separate positions and four different opinions issued by the six Court of Appeals judges involved in *Rounds* and *Argyelan*. Only today has the law become "established"—at least for the moment.

In establishing that law, it is of course true that "we should not feel compelled to

join the ranks of greater numbers when it has not been demonstrated that their way is the better way." *Majority Opinion, supra.* Any "better way," however, will never be found if this Court is not even willing to examine the rationale behind other conclusions and address the strengths and weaknesses of those positions on their relative merits.

The recalcitrance of the majority in this respect is self-apparent. While it is fully aware that no other jurisdiction in this day and age would adopt the position it has taken, its analysis does not extend beyond a cursory glance and summary recitation of *some* of the approaches employed elsewhere; a citation to *American Law Reports*[4] can hardly be said to fill that void.

Analysis could begin, however, with the case law of our own jurisdiction. The term "surface water" refers to water from falling rains or melting snow which is diffused over the surface of the ground, and which flows over or upon the surface running with the lay of the land, including its natural elevations and depressions, and has no channels or banks to guide its flow. *Gwinn v. Myers*, (1955) 234 Ind. 560, 129 N.E.2d 225; *Capes v. Barger*, (1953) 123 Ind.App. 212, 109 N.E.2d 725. Questions of liability for damages caused by surface water in Indiana have generally been governed by the "common enemy" doctrine.

The doctrine, which the majority both states and applies in its most simplistic and extreme form, had its origins in public policy favoring land improvement and development. Kinyon & McClure, *Interferences with Surface Waters*, 24 *Minn.L.Rev.* 891 (1940); Dobbins, *Surface Water Drainage*, 36 *Notre Dame L.Rev.* 518 (1961); *Barkley v. Wilcox*, (1881) 86 N.Y. 140, 40 Am.Rep. 519. *See also*, 93 A.L.R.3d 1193 (1979) Sometimes characterized as the "Massachusetts rule" based on its first American ap-

---

4. *See Majority Opinion, supra*, citing 93 A.L.R.3d 1193 (1979). An examination of the lead case reported in the annotation would be a start; in *Butler v. Bruno*, (1975) 115 R.I. 264, 341 A.2d 735, 93 A.L.R.3d 1183, the Supreme Court of Rhode Island fully analyzed the issue before us and discarded the common enemy doctrine for the rule of reasonable use. Within the context of the annotation, the approach adopted by the majority is characterized as the common enemy doctrine in its "extreme form." 93 A.L.R.3d at 1199.

plication in *Luther v. Winnisimett Co.,* (Mass.1851) 9 Cush. 171, Massachusetts *has since declared the doctrine a dead rule in that jurisdiction. Tucker v. Badoian,* (1978) 376 Mass. 907, 384 N.E.2d 1195 (Kaplan, J., concurring). As late as 1940, however, the doctrine was employed in twenty-two jurisdictions. 24 *Minn.L.Rev.* at 902–3.

Coterminous with the recognition and application of the common enemy doctrine in 19th century American jurisprudence was the development of the "civil law" rule, first employed in Louisiana. *Orleans Navigation Co. v. New Orleans,* (O.S.1812) 1 Martin 193. The rule generally proscribed any interference with the natural flow of surface water. Despite its obvious negative impact on land development, the rule by 1940 was employed in eighteen jurisdictions. 24 *Minn.L.Rev., supra,* at 896–7.

Meanwhile, a third approach—the rule of reasonable use—had also been recognized in *Bassett v. Salisbury Mfg. Co.,* (1862) 43 N.H. 569. Unlike the common enemy doctrine and civil law rule, which were founded on principles of property law, the rule of reasonable use embodies concepts of tort law. In its essence, the reasonable use rule strikes a balance between the common enemy doctrine and civil law rule. A landowner is permitted to alter surface water drainage as part of the reasonable use of his property and thereby cause some harm to adjacent landowners, so long as the interference with an adjacent landowner's use of his property is not unreasonable. *Franklin v. Durgee,* (1901) 71 N.H. 186, 51 A. 911; 24 *Minn.L.Rev., supra,* at 904. Perhaps because the rule embraced tort concepts, acceptance of the rule of reasonable use was slow to come. By 1940, only two jurisdictions had adopted the rule of reasonable use. *Bassett v. Salisbury Mfg. Co., supra; Bush v. City of Rochester,* (1934) 191 Minn. 591, 255 N.W. 256.

Today, however, the three different approaches occupy wholly opposite positions in terms of the respect they enjoy from this nation's jurisdictions. As the majority concedes: "Today, as we enter the last quarter of the 20th century, no jurisdiction follows the strict requirements of either the common enemy or civil law rule." *Butler v. Bruno,* (1975) 115 R.I. 264, 274, 341 A.2d 735, 741, 93 A.L.R.3d 1183, 1191.

Eighteen jurisdictions, as well as the American Law Institute, today embrace outright the rule of reasonable use. These jurisdictions have rejected the civil law rule and the common enemy doctrine out of an unwillingness to countenance the unconscionable results which, like the Havilands endure here, follow from a strict application of either rule. *See, Weinberg v. Northern Alaska Development Corp.,* (Alaska 1963) 384 P.2d 450; *Marment v. Castlewood Country Club,* (1973) 30 Cal.App.3d 483, 105 Cal.Rptr. 853; *Weldin Farms, Inc. v. Glassman,* (Del.1980) 414 A.2d 500; *Rodrigues v. State,* (1970) 52 Hawaii 156, 472 P.2d 509; *Klutey v. Commonwealth Dept. of Highways,* (Ky.1967) 428 S.W.2d 766; *Tucker v. Badoian, supra* (Mass.); *Johnson v. Agerbeck,* (1956) 247 Minn. 432, 77 N.W.2d 539; *County of Clark v. Powers,* (1980) Nev., 611 P.2d 1072; *Micucci v. White Mountain Trust Co.,* (1974) 114 N.H. 436, 321 A.2d 573; *Hopler v. Morris Hills Regional Dist.,* (1957) 45 N.J.Super. 409, 133 A.2d 336; *Pendergrast v. Aiken,* (1977) 293 N.C. 201, 236 S.E.2d 787; *Jones v. Boeing Co.,* (N.D.1967) 153 N.W.2d 897; *McGlashan v. Spade Rockledge Terrace Condo Development Corp.,* (1980) 62 Ohio St.2d 55, 402 N.E.2d 1196; *Butler v. Bruno, supra* (R.I.); *Mulder v. Tague,* (1971) 85 S.D. 544, 186 N.W.2d 884; *Houston v. Renault, Inc.,* (Tex.1968) 431 S.W.2d 322; *Sanford v. University of Utah,* (1971) 26 Utah 2d 285, 488 P.2d 741; *State v. Deetz,* (1974) 66 Wis.2d 1, 224 N.W.2d 407. *Accord, Restatement (Second) of Torts* § 821–833 (American Law Institute 1979).

Virtually every other jurisdiction, also mindful of the harsh results engendered by a strict application of either the civil law or common enemy doctrines, has applied a *significantly* modified version of their respective rules in order to accommodate equity and achieve a proper allocation of the costs arising from an alteration of surface water drainage. These decisions warrant particu-

lar attention in light of the majority's self-serving statement, made without citation to any legal authority, that "A substantial number of states have permitted but minor modifications . . ." to their rules. *Majority Opinion, supra.* The modifications of other jurisdictions are not at all "minor," as the following cases amply demonstrate. *See, e.g., Dekle v. Vann,* (1966) 279 Ala. 153, 182 So.2d 885 (exception to civil law rule applied in urban areas); *Turner v. Smith,* (1950) 217 Ark. 441, 231 S.W.2d 110 (common enemy rule modified to preclude landowner from doing unnecessary harm to adjacent properties); *Hankins v. Borland,* (1967) 163 Colo. 575, 431 P.2d 1007 (civil law rule modified to forbid landowner from altering quantity or manner in which water is discharged upon adjacent landowner); *Falco v. James Peters Association, Inc.,* (1973) 165 Conn. 442, 335 A.2d 301 (common enemy rule modified to forbid landowner from increasing amount or altering natural flow of surface water onto adjacent properties); *Ballard v. Ace Wrecking Co.,* (D.C.1972) 289 A.2d 888 (common enemy rule modified to require due care in alterations of property); *Cundiff v. Kopseiker,* (1953) 245 Iowa 179, 61 N.W.2d 443 (rule modified to preclude a material and undue increase in amount of surface water displaced); *Lindberg v. Lemenager,* (1979) 73 Ill.App.3d 623, 29 Ill.Dec. 825, 392 N.E.2d 382 (civil law rule modified by husbandry exception); *Battisto v. Perkins,* (1956) 210 Md. 542, 124 A.2d 288 (reasonable use modification of civil law rule); *Minton v. Steakley,* (Mo.App.1971) 466 S.W.2d 441 (common enemy doctrine modified by requirement that alterations of property and surface water flow be reasonable); *Snyder v. Platte Valley Public Power & Irrig. Dist.,* (1944) 144 Neb. 308, 13 N.W.2d 160 (common enemy rule modified by negligence standard); *Musumeci v. State,* (1974) 43 App.Div. 288, 351 N.Y.S.2d 211 (common enemy rule modified by maxim that one must use property in manner which does not injure that of another); *Iven v. Roder,* (Okla.1967) 431 P.2d 321 (common enemy doctrine modified by rule of reason); *Westbury Realty Corp. v. Lancaster Shopping Center, Inc.,* (1959) 396 Pa. 383, 152 A.2d 669 (civil law rule modified to preclude unreasonable changes in quantity of surface water discharged or manner of flow); *Deason v. Southern R. Co.,* (1927) 142 S.C. 328, 140 S.E. 575 (common enemy doctrine modified to comport with law of nuisances); *Seventeen, Inc. v. Pilot Life Ins. Co.,* (1974) 215 Va. 74, 205 S.E.2d 648 (common enemy rule modified to require that property be used in a manner which does not unnecessarily injure the property of another); *Morris v. McNicol,* (1974) 83 Wash.2d 491, 519 P.2d 7 (common enemy doctrine modified to require reasonable usage of property). *See generally,* 93 A.L. R.3d 1193, *supra.*

Some jurisdictions which have found it necessary to modify the common enemy doctrine from its simplistic form—or to dispatch it altogether—have recognized its particular inadequacy as applied to urban surface water disputes. *See, e.g., Chamberlin v. Ciaffoni,* (1953) 373 Pa. 430, 96 A.2d 140; *Seventeen, Inc. v. Pilot Ins. Co., supra.*

The majority should have examined what it is that prompted all other jurisdictions either to adopt outright the rule of reasonable use or to adopt a significantly modified version of their respective rules. We stand alone for many reasons.

Many jurisdictions, as previously cited, have simply been unwilling to countenance the extraordinarily inequitable results which follow from a doctrinaire application of the common enemy rule. Other considerations, however, have also sounded the death knell of the doctrine.

It has been recognized that the common enemy doctrine was born of an agrarian age, when it was a sacrosanct view of the law and the populace that a landowner could do whatever he wished with his property. *Butler v. Bruno, supra*; 24 *Minn.L. Rev., supra,* at 899. In 1878, for instance, when this Court decided *Taylor, Administrator v. Fickas, supra,* and penned the maxim that the majority invokes today, only 16.2 percent of Indiana's citizens resided in urban areas. Department of the Interior, Census Office, *Statistics of the Population of the United States at the Tenth*

*Census, June 1, 1880*, Table II, pp. 58–9 and Table IX, pp. 448–9 (1883).

In the 104 years since *Fickas* was decided, however, Indiana has undergone significant changes in its demographic and housing patterns. Today, 64.2 percent of our Hoosier population resides in urban environs. United States Department of Commerce, Bureau of the Census, *1980 Census of Population: Number of Inhabitants and Characteristics of the Population of Indiana*, vol. 1, part 16 (1982). Coupled with the high-density housing patterns have come technological changes which bear on the question before us.

As recognized in *Westbury Realty Corp. v. Lancaster Shopping Center, supra*, the technological ability to pave massive areas of ground surface was not developed until after the inception of the common enemy doctrine; similarly, the ability to radically alter natural drainage patterns and ground surfaces has followed from the creation of massive earth-moving machines. Together with these developments, as well as refinements in the construction industry and changes in our shopping patterns, the last thirty years have yielded an urban landscape dotted with giant commercial structures and vast shopping malls and plazas. The paved parking areas necessary to serve the customers of these various business enterprises lie in tight geographical juxtaposition with high-density residential housing. Major quantities of surface water from falling rain and melting snow, once absorbed into the ground, are now repelled from the vast roofs and parking lots and seek lower ground via unnatural drainage patterns.

The majority observes that "There has been no change in the forces that cause water to run downhill . . . ." It is true that as in 1878, when *Fickas* was decided, the forces of gravity, as indubitably established by Newton, continue unabated, as the facts of this case also amply demonstrate. The capacity of our developers to eliminate ground absorption and their present ability to transform a lower tract into the upper tract, however, has cast the language of nineteenth century legal propositions in a new perspective. While the majority has refused to examine these considerations, it is these matters which have prompted the widespread reexamination of the doctrine and the virtually unanimous conclusion that there is a "better way."

The inadequacies of the common enemy doctrine as applied to modern-day surface water disputes were fully discussed and explained by our Third District Court of Appeals in *Rounds*. For the majority of the Court, Judge Garrard observed that modern surface water disputes are "extremely fact sensitive" and require a certain flexibility not available in a strict application of the common enemy rule. *Rounds v. Hoelscher, supra*, at 1312. A literal application of the doctrine, he recognized, turns surface water questions into semantic struggles rather than substantive evidentiary disputes:

"Another problem may arise when the facts of a situation are forced into an exposition of the rule that results in the real import of the evidence being ignored. In *Argyelan, supra*, the common enemy doctrine and its exception for collected channeled waters were strictly applied to the facts and since no water was found to have been collected, discharged, or concentrated specifically, the court found no liability even though, as Judge Sullivan points out in his dissent, the trial court had found the water came over the wall like a waterfall and created a flooding problem which had never existed before." *Id.* at 1315.

Judge Garrard also observed that "In its strict form it has been criticized as encouraging hydraulic contests in which might makes right and a breach of the peace is threatened." *Id.* at 1311. He continued:

"[I]n the case before us we find neighboring land owners who live in a natural depression and who were essentially level with each other until filling was done. Additionally this case presents the situation criticized by the commentators concerning the common enemy rule. Its strict application would result in a hydraulic contest in which each owner would become the lower owner vis-a-vis

the owner of the last filled lot. He would then have an absolute right to build up his lot and cast the waters back upon his neighbor. We agree that surface water is a common enemy *but we also recognize it is deserving of a common solution and that an owner has no absolute right to benefit his own land by shifting his burden to his neighbor under the protection of a strict and antiquated rule of law.*" *Id.* at 1315 (emphasis added).

In perpetuating this "antiquated rule of law," the majority of this Court has overlooked all these various considerations and myopically focused on a single factor: "predictability." Without question, the doctrinaire application of the common enemy rule as enunciated 104 years ago is the most predictable of the alternatives available.

What is the nature of the "predictability" gained, however? A would-be developer can assess his legal obligations to adjacent landowners prior to construction. He can rest assured that if it is necessary to cut costs, drainage tiles and/or catch basins may be foresaken without fear of liability. In addition, lawsuits will be summarily resolved; unless a developer acted so blantantly as to dig a channel through to an adjacent property, no real legal question will be presented.

Also, we will have gained—predictably—the unpleasant specter of the inevitable lawsuit wherein the victimized homeowner is forced actually to vacate his home by virtue of the invading surface water. The offensive and predictable disposition of it, however, need not hang over this jurisdiction like the sword of Damocles. The value of predictability of these sorts, as opposed to the benefits to be gained by dispatching the common enemy doctrine, were discussed in the lead case of the A.L.R. citation cited by the majority:

"In embracing the principle of reasonable use, we are aware of those whose support of either of the two property-based rules is based on their conviction that adherence to either rule gives to a concerned landowner the advantage of predictability. * * * With the numerous judicial exceptions and modifications that have been appended through the years to the two original concepts, we fail to see how the modern versions of either afford more predictability than the rule of reasonable use. However, even if we were to assume that each did possess a higher predictability factor, a desire for certainty of liability should not and must not serve as a judicial pardon for the unreasonable conduct which has been manifested by any landowner in our modern society." *Butler v. Bruno, supra,* 115 R.I. at 274, 341 A.2d at 735, 93 A.L.R.3d at 1191.

In addition to its "predictability" rationale, the majority has suggested, by quoting Judge Hoffman's opinion in which he concurred in result in *Rounds,* that the question before us should be left to the legislature. Lacking a majority here, I agree the legislature should now act to bring this jurisdiction into the 20th century.

The majority ought to examine, however, Ind.Code § 34–1–52–1 (Burns 1973), where, 101 years ago or three years after *Fickas* was decided, our legislature defined its approach to questions such as that before us. The statute reads:

"Whatever is injurious to health, or indecent, or offensive to the senses, or an *obstruction* to the free *use of property,* so as essentially to interfere with the *comfortable enjoyment* of life or *property,* is a nuisance, and the subject of an action." (Our emphasis.)

Defined in the statute is an action to recover damages to the use and enjoyment of property under the theory of nuisance. Its applicability is not limited to injuries occasioned via particular mediums; the legislature stated that "whatever" caused the unlawful interference, the nuisance action could be employed by the victimized property owner. In addition, injury to the health or senses is not the sole gravamen of the statute. *Yeager & Sullivan, Inc. v. O'Neill,* (1975) 163 Ind.App. 466, 324 N.E.2d 846. Rather, as the legislature also stated, the catalyst of the statute is "an obstruction" to the use and enjoyment of property.

Obviously, the statutory action of nuisance, though not pleaded here, is applicable to the victims of unreasonable alterations in surface water drainage such as the Havilands. They suffer a very real and serious obstruction in their use of their driveway, garden, garage, and utility shed. Consistency in our laws would deem that our common law surface water rules comport with our statutory nuisance-to-property principles and that the Havilands be permitted recovery, just as would be the case if they had proceeded under the statutory remedy also available to them.

In terms of fundamental principles of liability, there is no rational justification for distinguishing between interferences with the use of property occasioned by surface water, as opposed to other mediums such as pollution, sound, or vibration. *See, e.g., Muehlman v. Keilman*, (1971) 257 Ind. 100, 272 N.E.2d 591 (unreasonable noise from adjacent tractor-trailer operation would warrant recovery); *Friendship Farm Camps, Inc. v. Parson*, (1977) 172 Ind.App. 73, 359 N.E.2d 280 (damages and injunctive relief warranted by adjacent marching band operation creating unreasonable noise); *Yeager & Sullivan, supra*, (noxious odors from adjacent hog-raising operation warranted award of damages); *Cox v. Schlachter*, (1970) 147 Ind.App. 530, 262 N.E.2d 550 (odors from adjacent mice-raising operation warranted recovery of damages). *See also, Restatement (Second) of Torts* § 831, p. 141 (American Law Institute 1979; 24 *Minn.L.Rev.* 891, *supra*.

Other jurisdictions have recognized that no rational distinction exists by which to exclude surface water from the realm of nuisance law and principles. *See, e.g., Butler v. Bruno, supra*, at n. 6 ("the invasion of one's property by surface waters can be a nuisance, no different from an invasion by noise, noxious vapors, or the like"); *Deason v. Southern R. Co., supra* (common enemy doctrine expressly modified to comport with nuisance law); *cf., Rossow v. Jones*, (1980) Ind.App., 404 N.E.2d 12 (insofar as landlord's duty to maintain common entryways in a safe condition, no distinction exists between a landlord's responsibility to repair

boards, as in *LaPlante v. LaZear*, (1903) 31 Ind.App. 433, 68 N.E. 312, and his duty to remove natural accumulations of snow and ice).

As embodied within our case precedent and nuisance statute, our ultimate concern in any instance must continue to be whether the circumstances justify shifting the loss from the victimized property owner to the person responsible for the interference to the use and enjoyment of property. It is, as we stated in *Muehlman*, a question of reasonableness; the rule reflects respect for the Latin maxim expressly recognized in our property case law, *sic utere tuo ut alienum non laedas* (so use your property as not to injure the rights of another). *Indiana Motorcycle Ass'n v. Hudson*, (1980) Ind. App., 399 N.E.2d 775; *Albright v. Crim*, (1933) 97 Ind.App. 388, 185 N.E. 304. The maxim is particularly applicable to surface water disputes which, as Judge Garrard accurately observed, are "extremely fact sensitive."

Finally, the majority has observed that it is not "disposed to make drainage commissions of our already overburdened trial courts." *Majority Opinion, supra*. It is not this Court's prerogative to arbitrarily define which invasions of a homeowner's property warrant relief when the legislature has established a cause of action for an "obstruction" to the "use" and "enjoyment" of property. Ind.Code § 34-1-52-1, *supra*. Rather, it is our duty as this state's highest court to perpetuate the constitutional guarantee accorded our citizens in Article 1, Section 12 of the Indiana Constitution:

"All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

Consistent with our Constitution, the Court of Appeals has held that certification by a drainage commission that a proposed system of drainage will adequately handle surface water run-off does not relieve a devel-

oper from his legal duties to adjacent land-owners. *Gene B. Glick Co., Inc. v. Marion Construction Corp., supra.*

The majority's suggestion that our court system does not have time to provide the potential for a remedy to those who suffer the plight of the Havilands is an affront to our Constitution. It is, in effect, a confession of judicial impotence to serve our citizens' guarantees, as Dean Prosser succinctly acknowledged:

> "It is the business of the law to remedy wrongs that deserve it, even at the expense of a 'flood of litigation'; and it is a pitiful confession of incompetence on the part of any court of justice to deny relief upon the ground that it will give the court too much work to do." Prosser, *Intentional Infliction of Mental Suffering, a New Tort,* 37 *Mich.L.Rev.* 874, 877 (1939) (footnotes omitted).

In all this there is neither nothing new or extreme. Our decision in *Conner,* as well as the Third District Court of Appeals' decision in *Rounds,* is consistent with the constitutional, statutory, and policy considerations discussed herein. Absent recognition of the rule of reasonable use, as it was enunciated in *Rounds,* this Court should adopt a modified version of the common enemy doctrine, as so many jurisdictions have done. Although the majority has not addressed this alternative, the doctrine could be modified to comport with Ind.Code § 34–1–52–1, *supra,* or to require undue harm not be inflicted on adjacent landowners, or to impose a reasonable degree of care on urban landowners. Any of these alternatives would preclude the incredibly harsh results endured by the Havilands. Instead, the majority of this Court has reverted to an antiquated rule of law outside the pale of logic or legal authority, a rule so extreme that its doctrinaire application is shunned by all other jurisdictions of this nation.

In these respects, the Havilands endure not only the unfortunate happenstance of residing next to the property where the Argyelans built their business structures, but also the misfortune of residing in Indiana and falling within its legal jurisdiction.

I dissent. The Second District Court of Appeals' opinion and decision should be reversed and vacated, and the judgment of the trial court should be reinstated.

GIVAN, C. J., concurs.